ALLRIGHT PROPERTIES, INC., Plaintiff-Respondent,†

v.

CITY OF MILWAUKEE, Defendant-Appellant.

Court of Appeals

*No. 2008AP510. Submitted on briefs September 8, 2008.
—Decided March 10, 2009.*

2009 WI App 46

(Also reported in 767 N.W.2d 567.)

† Petition to review denied 6/16/09.

233

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Grant F. Langley*, city attorney and *Vincent D. Moschella*, deputy city attorney of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Robert L. Gordon* and *Alan Marcuvitz* of *Michael Best & Friedrich LLP* of Milwaukee.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. KESSLER, J. Allright Properties, Inc., paid real property taxes assessed by the City of Milwaukee for the years 2004 and 2005, then sued, pursuant to WIS. STAT. § 74.37(3)(d) (2005–06),[1] "to recover that amount of general property tax imposed because the assessment of property was excessive." *See* § 74.37(1). After a long court trial, the trial court issued a detailed written opinion[2] concluding that the City's appraisal of $10,115,000 as the fair market value of the property was excessive and that Allright's appraisal of

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted. We note that the 2005–06 version of each statute cited in this opinion is identical to the 2007–08 version, with the exception of WIS. STAT. § 73.03(2a), which now provides for an electronic version of the *Wisconsin Property Assessment Manual for Wisconsin Assessors*.

[2] We would like to acknowledge the trial court's careful consideration of significant technical testimony concerning numerous approaches to assessment used in this case. While we ultimately disagree with the court's legal conclusions, the court's analysis assisted us in analyzing myriad issues.

$3,300,000 as the fair market value of the property was "more credible." Based on Allright's valuation, the court awarded Allright a refund of the excess taxes paid. The City appealed.

¶ 2. We reverse. We disagree with the trial court's conclusion that the City failed to follow the applicable assessment rules, and its conclusion that Allright did follow them. We conclude that Allright has failed to rebut the statutory presumption that the City's assessment was correct, in part because it failed to consider income that appertains to the land. Further, we disagree with Allright's claim and the trial court's conclusion that the City's assessment violates the uniformity clause of the Wisconsin Constitution. For these reasons, we reverse and remand with directions to enter judgment in favor of the City, upholding its original assessment.

## BACKGROUND

¶ 3. Allright owns 8.715 acres of real estate on South Howell Avenue, the main road on the west side of the entrance to General Mitchell International Airport in Milwaukee. Allright operates the property as a commercial surface parking lot that primarily serves those who are using the airport. The parking lot is fenced around the perimeter and has an asphalt surface, 1450 marked parking stalls, a ticket booth and ticket dispenser covered by a canopy, automatic gate arms and exterior lighting. Allright provides twenty-four hour locked and guarded security at the parking lot, and shuttle service to and from the airport. The property also contains a 1420–square-foot building containing an office and a warehouse/garage.

¶ 4. When the City conducted its assessment process for years 2004 and 2005, the City assessor con-

cluded there had been no recent sale of this specific property, and no recent sales of comparable property. Thus, the assessor considered the "income approach" and the "cost approach" to value the property.[3] The City assessed taxes on the property in the amount of $261,573.90 for 2004 and $247,817.51 for 2005, based on its conclusion that the value of the property for both 2004 and 2005 was $10,115,000.

¶ 5. Allright timely appealed these assessments, each of which was sustained by the board of review. Allright timely paid the taxes and served the City with a claim for excessive assessment pursuant to WIS. STAT. § 74.37(2)(a).[4] The City disallowed the claim.

¶ 6. Next, Allright timely brought this action in the trial court to recover the excess taxes it paid, alleging that it should have paid taxes based on a fair market value of $3,300,000. *See* WIS. STAT. § 74.37(3)(d).[5] The parties stipulated that the court's decision would also govern the 2006 assessment of the property.

¶ 7. The claim was tried to the court on December 18 and 19, 2006. Allright presented three witnesses: appraisers Lawrence Nicholson and S. Steven Vitale, and Michael Kenney, who is General Manager of

---

[3] These terms are discussed in greater detail *infra.*

[4] WISCONSIN STAT. § 74.37(2)(a) provides: "A claim for an excessive assessment may be filed against the taxation district, or the county that has a county assessor system, which collected the tax."

[5] WISCONSIN STAT. § 74.37(3)(d) provides:

If the taxation district or county disallows the claim, the claimant may commence an action in circuit court to recover the amount of the claim not allowed. The action shall be commenced within 90 days after the claimant receives notice by registered or certified mail that the claim is disallowed.

Wisconsin Operations for Allright's corporate parent. The City presented testimony from City of Milwaukee Senior Property Appraiser Daniel R. Furdek and Chief Assessor Peter C. Weissenfluh.

¶ 8. After post-trial briefing, but prior to the trial court issuing its written decision, the City learned that Allright had sold the property on May 22, 2007, for $12,300,000. Allright had recorded the deed on July 26, 2007 and had filed an electronic real estate transfer tax return with the Wisconsin Department of Revenue on September 6, 2007.[6] The City moved to reopen the record to include this evidence. Allright opposed the motion to reopen the record, claiming that the transfer was "far too remote" to be relevant to the property's value in 2004 and that the sale was not an arm's-length transfer because it was part of a sale to equity investors by Allright's parent company. The trial court heard arguments from the parties, but did not take testimony on this issue.

¶ 9. The trial court issued its written decision on January 16, 2008, which addressed both the trial and the motion to reopen the evidence. First, it denied the City's motion to reopen the trial record to introduce evidence of the 2007 sale. Second, it found that the fair market value of the property was $3,300,000 and that the City's assessment was invalid because "the assessor failed to consider comparable sales in the assessment process as required by Wisconsin law." Thus, the court found that taxes should have been paid based on a fair market value of $3,300,000 and ordered a refund of excess taxes paid by Allright. Finally, the court con-

---

[6] It is undisputed that Allright's counsel was not aware of the transfer before the City brought it to the trial court's attention.

cluded that the assessment also violated article VIII, section 1 of the Wisconsin Constitution because it was not made on a uniform basis with other properties in the City. This appeal follows.

## LEGAL STANDARDS

¶ 10. The rules for real property assessment begin with WIS. STAT. § 70.32(1), which provides in pertinent part:

> Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) . . . at the full value which could ordinarily be obtained therefor at private sale. In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed[;] . . . recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.

*Id.* This statute requires adherence to the *Wisconsin Property Assessment Manual for Wisconsin Assessors* (hereafter "*Property Assessment Manual*"),[7] absent conflicting law. *Walgreen Co. v. City of Madison*, 2008 WI 80, ¶ 3, 311 Wis. 2d 158, 752 N.W.2d 687. Thus, we analyze the applicable statutes "in conjunction with basic principles of real property assessment as described by case law, treatises, and the *Property Assessment Manual.*" *Id.*, ¶ 19.

¶ 11. The *Property Assessment Manual* and case law set forth a three-tier assessment methodology to

---

[7] The *Property Assessment Manual* is revised from time to time. In this case, the parties cite to the version last revised in December 2004. Thus, we will likewise rely on the December 2004 version of the *Property Assessment Manual.*

determine a property's full value. *Adams Outdoor Adver., Ltd. v. City of Madison*, 2006 WI 104, ¶ 34, 294 Wis. 2d 441, 717 N.W.2d 803. *Adams* explained:

> Evidence of an arm[']s-length sale of the subject property is the best evidence of true cash value. [Tier 1] If there has been no recent sale of the subject property, an assessor must consider sales of reasonably comparable properties. [Tier 2] Only if there has been no arm[']s-length sale and there are no reasonably comparable sales may an assessor use any of the third-tier assessment methodologies. [Tier 3]

*Id.* (citations omitted).

¶ 12. A party that is dissatisfied with an assessment may bring an excessive tax assessment claim under Wis. Stat. § 74.37(3)(d). "This is not a certiorari review." *Bloomer Hous. Ltd. P'ship v. City of Bloomer*, 2002 WI App 252, ¶ 11, 257 Wis. 2d 883, 653 N.W.2d 309. Acting pursuant to § 74.37(3)(d), the trial court makes determinations concerning excessive tax assessment claims "without giving deference to any determination made at a previous proceeding," including a proceeding before the board of review. *Nankin v. Village of Shorewood*, 2001 WI 92, ¶ 25, 245 Wis. 2d 86, 630 N.W.2d 141. "The court must only give presumptive weight to the assessor's assessment." *Id.* (citing Wis. Stat. § 70.49(2)). The assessor's assessment " 'is presumed correct only if the challenging party does not present significant contrary evidence' " and " '[n]o presumption of correctness may be accorded to an assessment that does not apply the principles in the *Property Assessment Manual.*' " *Walgreen*, 311 Wis. 2d 158, ¶ 17 (citations omitted; bracketing supplied by *Walgreen*). Stated differently, when a city assessor correctly applies the *Property Assessment Manual* and Wisconsin stat-

utes, and there is no significant evidence to the contrary, courts will reject a party's challenge to the assessment. *See id.*

¶ 13. On appeal, we defer to the trial court's findings of fact. *See Adams*, 294 Wis. 2d 441, ¶ 27 ("Where there is conflicting testimony the fact finder is the ultimate arbiter of credibility."). However, "[a]pplying the law to the facts presents a question of law that we review independently." *Id.* "Failure to make an assessment on the statutory basis is an error of law" and we review *de novo* "[w]hether the [c]ity followed the statute in making its assessment." *Id.*, ¶ 26. In addition, we independently review the trial court's conclusion that the City violated article VIII, section 1 of the Wisconsin Constitution. *See Duesterbeck v. Town of Koshkonong*, 2000 WI App 6, ¶ 10, 232 Wis. 2d 16, 605 N.W.2d 904 (case involving uniformity claim presented questions of statutory and constitutional interpretation that court reviewed *de novo*); *see also Northwest Airlines, Inc. v. DOR*, 2006 WI 88, ¶¶ 25, 62–66, 293 Wis. 2d 202, 717 N.W.2d 280 (applying *de novo* review to "questions of law involving statutory interpretation and a challenge to the constitutionality of a tax exemption," including assertion that uniformity clause was violated).

## DISCUSSION

¶ 14. At issue is the trial court's conclusion that Allright presented "significant contrary evidence" that rebutted the statutory presumption that the City's assessment was correct. *See Adams*, 294 Wis. 2d 441, ¶ 25 (WISCONSIN STAT. § 70.49(2) requires the trial court to give presumptive weight to the city's assessment, but

"the assessment is presumed correct only if the challenging party does not present significant contrary evidence."). Underlying the trial court's ruling are its conclusions that the City's assessment was inconsistent with the *Property Assessment Manual,* and that Allright's valuation was consistent with the *Property Assessment Manual* and constituted significant contrary evidence of fair market value.

¶ 15. The City argues that the judgment should be reversed on several grounds. First, it argues that the trial court erred when it refused to admit evidence of the May 2007 transfer of the property, which the City asserted was "evidence of a first-tier transaction" that would be determinative. We decline to consider this issue because we conclude that even without this evidence, the City's assessment was not excessive. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need to be addressed).

¶ 16. Second, the City challenges the trial court's conclusion that the City failed to follow the *Property Assessment Manual.* Specifically, the City asserts that the trial court erroneously rejected the City's use of income generated from the property in determining the value of the property. The City also contends the trial court should not have concluded that sales of comparable property could be utilized, and should not have relied on that conclusion as the basis to set aside the presumption that the City's assessment was correct. We agree with the City. We conclude that the City's assessment was consistent with the *Property Assessment Manual,* and that Allright's valuation was not because it failed to take into account income that appertained to the land. *See Adams,* 294 Wis. 2d 441, ¶ 27 (whether assessment made in accordance with *Property Assessment Manual* is question of law). Thus, we conclude

241

that Allright's valuation, which was not made in accordance with the *Property Assessment Manual,* did not constitute significant contrary evidence rebutting the statutory presumption in favor of the City's assessment. For these reasons, we reverse and remand with directions to enter judgment for the City.[8]

¶ 17. Finally, the City argues that the trial court erred when it concluded that the City's assessment violated the uniformity clause, which was an alternative ground to reject the City's assessment. We agree with the City and also reverse on this ground.

## I. Highest and best value, and approaches to valuation.

¶ 18. All parties agree that the real estate must be valued at its highest and best use. The *Property Assessment Manual* defines that concept:

> In determining the highest and best use of a property, the assessor must consider those uses which are physically possible for the site, those uses which are allowable according to zoning or other local ordinances, and feasible uses which will provide a net return to the owner. *The use providing the highest net return to the owner is generally considered the highest and best use for the site.*

---

[8] Although the Citys valuation at trial was for an amount greater than the original assessment, the City is not seeking to increase the original assessment and seek additional payment. *See Trailwood Ventures, LLC v. Village of Kronenwetter,* 2009 WI App 18, 10 n.5, 315 Wis. 2d 791, 762 N.W.2d 841 (Ct. App. 2008) (WISCONSIN STAT. § 74.39 does not authorize a court in a suit for refund of excess taxes to impose a greater tax burden on the taxpayer than the assessment established by the board of review).

1 *Property Assessment Manual* at 8–2 (emphasis added). Nicholson, Allright's expert, concluded that "the highest and best use of the subject property is as currently improved with a parking lot until such time that redevelopment to a higher and better commercial use is economically feasible." Furdek, the City's expert, concluded that "the highest and best use of the subject land 'as though vacant' is for development of an airport surface parking facility" and that the current use of the property was consistent with the highest and best use both "as though vacant" and "as improved."

¶ 19. The *Property Assessment Manual* provides that "[t]he valuation of commercial property should follow the same procedures as the valuation of other real property," the goal of which "is to estimate market value." 1 *Property Assessment Manual* at 9–5. It explains that "[e]stimates of market value can be derived by using the cost, income, or sales comparison approaches." *Id.*; *see also Walgreen*, 311 Wis. 2d 158, ¶ 21 (*Property Assessment Manual* recognizes three methods of property assessment). The *Property Assessment Manual* provides that appraisers "should *consider* all three approaches when estimating the value of a property" but cautions that "all three approaches may not be developed in an appraisal because a sufficient amount of data may not be available or, due to the specific property characteristics, the approach may be considered less reliable in estimating market value." 1 *Property Assessment Manual* at 7–28 (emphasis in *Property Assessment Manual*). When considering commercial property, the *Property Assessment Manual* indicates that the income approach is especially important, stating:

> Because buyers and sellers of commercial properties usually base their transaction decisions on the

243

property's net operating income, the assessor must be able to apply the income approach. The cost approach is frequently used for new construction, special purpose properties (i.e., funeral homes, medical facilities) or when sales and income/expense information are not readily available or not appropriate.

1 *Property Assessment Manual* at 9–5.

## II. Application of the three-tier assessment methodology.

¶ 20. As previously noted, the *"Property Assessment Manual* and case law set forth a three-tier assessment methodology to ascertain true cash value," also known as fair market value. *Adams*, 294 Wis. 2d 441, ¶ 34; *see also* WIS. STAT. § 70.32(1). Applied here, we see that both parties used only the Tier 3 assessment methodology.

### A. Tier 1.

¶ 21. The best evidence of fair market value— known as Tier 1—is a "recent arm's-length sale[] of the property." *See* WIS. STAT. § 70.32(1). It was undisputed at trial that there was no Tier 1 arm's-length sale of the subject property that could be used to assess its value.[9] *See Adams*, 294 Wis. 2d 441, ¶ 34.

### B. Tier 2.

¶ 22. The Tier 2 assessment methodology requires an assessor to consider sales of "reasonably comparable" properties. *See* WIS. STAT. § 70.32(1). The

---

[9] The City contends the May 2007 transfer of the property would qualify as a Tier 1 sale, but for the reasons stated, *see infra,* ¶ 15, we do not consider whether that sale should have been admitted as evidence.

principles of the sales comparison method of valuing property are described in the *Property Assessment Manual*:

> Comparable sales refer to properties that represent the subject property in age, condition, use, type of construction, location, number of stories, physical features and economic characteristics. The more similar the sold property is to the subject, the more valid is the sale price as an indicator of the value of the subject property.

1 *Property Assessment Manual* at 7–18. These considerations apply to the property as a whole.

■

¶ 23. Here, the trial court found that Allright had applied the Tier 2 assessment methodology. Specifically, the trial court found that Nicholson, Allright's expert, had applied a Tier 2 analysis. The trial court faulted the City for not applying that approach. However, the testimony reveals that both the City's and Allright's experts agreed that there were no sales of comparable property on which to base a Tier 2 analysis.

¶ 24. Furdek, the City's appraiser, concluded in his written report that there were "insufficient recent sales of reasonably comparable properties to be relied upon to determine the fair market value for the subject property. For these reasons the sale of the subject property and the sales comparable approach w[ere] not relied upon to determine the fair market value of the property."

¶ 25. Similarly, Nicholson acknowledged that he could not find any properties that he considered comparable to the Allright property as a whole. Specifically, there were no recent sales of comparable parking lots either near the airport or in any other submarket in

Milwaukee. Nicholson's report explained why there were no sales of comparable properties:

> Our market investigations first focused on sales of *parking lots in the vicinity of* General Mitchell International Airport; *no such sales were found.* We then broadened our search to include *large parking lot sales located outside downtown* Milwaukee, a submarket that is considered distinctively different than the airport submarket or any other submarket throughout Milwaukee; *no large public parking lot sales were found.*

(Emphasis added.)

¶ 26. At trial, Nicholson testified to the same findings of lack of comparable sales that he explained in his report:

> *I did not use a sales comparison approach for the parking lot in its entirety because I couldn't find sales of large parking lots that would be—that I would deem as comparable, so I didn't use the sales comparison approach again to value the property as a parking lot.*
>
> . . . .
>
> . . . I told you earlier I had not done a sales comparison approach for parking lots just on the land.
>
> . . . .
>
> . . . The first thing I did was look for *sales of parking lots in the area. Couldn't find any. Couldn't find any outside of downtown Milwaukee* which I didn't think was a similar or comparable area.
>
> . . . I then look[ed] for large tracts of commercial land sales up and down Howell Avenue.

246

The property next door ... Executive Parking sold ... but that was [a] related-party transaction so that isn't really an arm's length type of transaction so I didn't use that as a sale.[10]

(Emphasis and footnote added.)

¶ 27. Thus, experts for both Allright and the City agreed that there were no recent sales of comparable property as a whole. Nonetheless, the trial court specifically found that Nicholson "considered the sales approach, the cost approach and the income approach, and concluded his appraisal with a reconciliation." The trial court faulted the City for not considering "reasonable comparable sales," stating: "This Court finds that there were reasonable comparable sales that should have been considered by the assessor in assessing the property for 2004. Failure to consider comparable sales when such sales were available was error."

¶ 28. The trial court's finding that the City erred by failing to use the Tier 2 method of valuation is clearly erroneous, given that both Nicholson and the City testified, without any evidence to the contrary, that there were no recent sales of comparable properties. Thus, the court erred when it concluded that Nicholson had used the sales comparison approach to value the property and that the City failed to follow the *Property Assessment Manual* because it did not use the sales comparison approach.[11]

---

[10] Interestingly, in their respective opinions on the value of the land portion of Allright's real estate, the exact property (Executive Parking) that Nicholson refused to consider "comparable" was included as "comparable" by Allright's other witness, Vitale.

[11] The trial court's finding that Allright presented evidence of comparable sales that could be used in a Tier 2 analysis may

## C. Tier 3.

¶ 29. Because there were no recent arm's-length sales of the property or sales of reasonably comparable properties, (Tiers 1 and 2), the parties had to apply a Tier 3 analysis. In *Adams*, the court explained the approaches to valuation that may be applied in a Tier 3 analysis:

> Within tier three, an assessor may consider "all the factors collectively which have a bearing on value of the property in order to determine its fair market value." These factors include "cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals produced by the owner."

*Id.*, 294 Wis. 2d 441, ¶ 35 (citations omitted). *Adams* further explained that "[t]he income approach, which seeks to capture the amount of income the property will generate over its useful life, and the cost approach, which seeks to measure the cost to replace the property, both fit into this analytic framework." *Id.* (citation omitted).

¶ 30. The *Property Assessment Manual* provides additional guidance on both the cost approach and the income approach to valuation. It explains:

> The cost approach can be used when valuing properties for which there is inadequate sales information. This approach can be used for such properties as banks, corporate offices, and other special purpose uses. The cost approach is the value of the land plus the cost of the improvements minus any depreciation . . . .
>
> . . . .

have been due to Allright's repeated reference to "comparable sales" *of land only* during its Tier 3 analysis.

... The income approach can be used when there are no comparable sales. *It may be the most reliable method in estimating the value of commercial property because it represents the way investors think when they buy and sell income property in the market.*

1 *Property Assessment Manual* at 9–11 (emphasis added).

## III. Analysis of the appraisals.

¶ 31. Having concluded that both parties used a Tier 3 analysis to determine value, we must now more closely examine the parties' respective approaches to a Tier 3 analysis. We conclude that the City's approach was consistent with the *Property Assessment Manual,* and that the trial court erroneously concluded otherwise. We further conclude that because Allright did not consider the income generated by the property, Allright's valuation approach was not consistent with the *Property Assessment Manual,* and did not, therefore, constitute "significant contrary evidence" to rebut the statutory presumption that the City's assessment was correct. *See Adams,* 294 Wis. 2d 441, ¶ 25.

### A. The City's appraisal.

■■■

¶ 32. The City's appraiser, Daniel Furdek, considered the income approach, the cost approach and the sales comparison approach. For the reasons described above, he rejected the sales comparison approach because "[n]o comparable sales of airport surface parking facilities were found." Furdek applied two variations of the income approach in valuing the property. Under the income approach, Furdek valued the property at

$12,708,000 for 2004. Under the cost approach, he valued the property at $13,183,000 for 2004.

¶ 33. According to his report, Furdek considered several applications of the income approach.[12] When he initially valued the property before this litigation, he did not have access to Allright's actual income from the property, so he had to use an estimate. This produced an income approach value of $10,115,000 based on estimates of income earned by other nearby airport parking structures or facilities. When Allright provided actual income figures for 2001, 2002 and 2003, the City appraised the property based on income capitalization and on discounted cash flow. Both methods are described in the *Property Assessment Manual*.

¶ 34. Furdek's report explained that the income capitalization method calculates the "present worth of future rights to income."[13] The income from the improved property at its highest and best use (here a surface parking lot) is calculated. All "pertinent expenses (experienced under competent management)" are deducted. The resulting net income is capitalized. The capitalization rate was determined in a manner described by the *Property Assessment Manual*. Under the income capitalization approach, the 2004 value of the property was $12,291,000 and the 2005 value was $13,693,000.

¶ 35. Furdek also performed a discounted cash flow analysis.[14] This method projects revenues and

---

[12] 1 *Property Assessment Manual* at 9–11 identifies the steps in the income approach to valuing property. Furdek followed those steps.

[13] The income capitalization method is described in 1 *Property Assessment Manual* at 9–19 to 9–22.

[14] The discounted cash flow analysis is described in 1 *Property Assessment Manual* at 9–23 to 9–24.

operating expenses over a specific period of time, then reduces the value of that stream of income to value the property "as is." The actual income and operating expenses are considered, adjusted if necessary, and projected over a period of years. The net operating income for each year is determined and then reduced to a present value by applying a capitalization rate appropriate to that year. The capitalized values are then added to determine the present value of the property that produces that stream of income. The property value under the discounted cash flow method was $12,708,000.

¶ 36. In addition to the income approach, Furdek considered the cost approach.[15] *See* 1 *Property Assessment Manual* at 9–11. Furdek applied the steps required by the *Property Assessment Manual* to perform a cost approach appraisal. The cost approach requires that the land be valued separately from the structures on the land. *See* 1 *Property Assessment Manual* at 8–19. To value the land only, Furdek calculated the net operating income attributable to the improvements on the land and then subtracted that figure from the net operating income from the whole property. That calculation produced the "residual value" of the land. *See* 1 *Property Assessment Manual* at 9–8 and 9–23 (describing the calculation using land residual method).

¶ 37. Next, the present cost to construct all of the improvements was estimated.[16] An addition was made for the developers' profit and a reduction was made for

[15] The basic steps in the cost approach are described in 1 *Property Assessment Manual* at 7–22.

[16] These costs are apparently generally available as estimates in published manuals used in the industry. Both Furdek and Nicholson used such manuals.

251

accrued depreciation. Under this method, the Allright property was valued at trial at $13,183,000 for 2004 and $13,317,000 for 2005.

¶ 38. Finally, Furdek compared the various approaches considered and concluded that "[s]ince most investors purchase commercial property for its income producing potential, the income approach is given the greatest weight in the final value conclusion" and that valuing the land by the land residual method "is an excellent method when most of the income is derived as a result of the land versus the improvements."

¶ 39. Allright argued that it was improper for the City to use the income generated on the property when determining the value of the real property because that improperly included the separate value of "the going concern value of the parking business which Allright operates on the property."[17] The trial court agreed with Allright and rejected the City's appraisal, concluding that the income from the parking lot did not "appertain to the land" and thus could not be considered in valuing the property. In that legal conclusion, the trial court erred.

¶ 40. Real property, as relevant to these proceedings, is defined by Wis. Stat. § 70.03, which provides: " 'Real property', 'real estate' and 'land', when used in chs. 70 to 76, 78 and 79, include not only the land itself but all buildings and improvements thereon, and all fixtures and *rights and privileges appertaining thereto* [with limited exceptions]." Sec. 70.03 (emphasis added). Case law provides further discussion of value that

___

[17] Allright's argument may be correct when the income does *not* appertain to the land. *See* 1 *Property Assessment Manual* at 7–5.

252

appertains to property: "A value that appertains to property is one that is transferable with the property." *ABKA Ltd. P'ship v. Board of Review*, 231 Wis. 2d 328, 336, 603 N.W.2d 217 (1999). The test to be applied, in the analysis of whether the value of business income from the property is appended to the property, was formulated in *State ex rel. N/S Associates v. Board of Review*, 164 Wis. 2d 31, 473 N.W.2d 554 (Ct. App. 1991), and reaffirmed in *ABKA*. The test is whether the value of the income is " 'independent of the property so that the value either stays with the seller or dissipates upon sale.' " *Id.*, 231 Wis. 2d at 337 (citation omitted). If the value of the income is independent of the land, it does not appertain to the land.

¶ 41. The concept of appertaining to the land has also been referred to as the income being "inextricably intertwined" with the property, where the property "possess[es] an inherent capacity to generate income due to its location . . . and also represents the actual site of income generation." *Id.* at 343. The income is inextricably intertwined with, and appertains to, the land under WIS. STAT. § 70.03, where the income-generating capability can be transferred with the real estate. *See N/S Assocs.*, 164 Wis. 2d at 55. "When business value is transferable with the underlying real estate, the business value is appended to the real estate rather than attributable to the personal skill and expertise of the owner." *Adams*, 294 Wis. 2d 441, ¶ 79. These rights appertaining to the land have been held to include the income generated from renting spaces in a shopping mall, *see N/S Assocs.*, 164 Wis. 2d at 55; the potential for income from management of the rental of condo units in a resort located on the property, *see ABKA*, 231 Wis. 2d at 331; and the income generated from opera-

tion of a landfill on the property, *see Waste Mgmt. of Wis., Inc. v. Kenosha County Bd. of Review*, 184 Wis. 2d 541, 545, 516 N.W.2d 695 (1994).

¶ 42. In *N/S Associates*, the purchaser, like Allright here, argued that the assessor improperly included in the appraisal the shopping mall's "business value"—the income from rent from, and management services provided to, the mall tenants—which it claimed did not appertain to the property. *Id.*, 164 Wis. 2d at 52–53. In effect, N/S Associates argued that the management business was a going concern, something separate from the shopping mall. *See id.* We rejected that argument, noting that the "mall's *raison d'être*—namely, the leasing of space to tenants and related activities such as trash disposal, baby stroller rentals, etc.—is a transferable value that is inextricably intertwined with the land and 'all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto.' " *Id.* at 55 (quoting Wis. Stat. § 70.03). For similar reasons, we reject Allright's argument here. The parking lot's *raison d'être* is renting parking space to airport travelers, who are attracted by the proximity to General Mitchell International Airport, the lot security, and the shuttle service between the lot and the airport terminal. All such attractions are transferable with the sale of the property.

¶ 43. In *Waste Management*, Waste Management disputed the assessment of a landfill it operated, arguing that it was improper to include the income from operating the property as a landfill. *Id.*, 184 Wis. 2d at 545–46. Waste Management argued that its special skill and the specific license necessary to operate a landfill were the value of an ongoing business concern and should not be included in the value. *Id.* at 548–49. Further, Waste Management argued that Wisconsin law

permitted consideration *only* of market rents in applying the income method of real estate valuation.[18] *Id.* at 560–61.

¶ 44. Our supreme court rejected Waste Management's challenge to the assessment, explaining when income can be included in land valuation:

[U]nder the mandate of [WIS. STAT. § 70.32(1)], the following rules have been developed with respect to the specific use of income generated from real estate as a basis for valuing that property: (1) Evidence of net income may be utilized in order to show the fair market value of a parcel of land, but only in the absence of a recent arm's-length sale of the property or sales of reasonably comparable property. (2) Income may never be the sole basis for an assessment of property.

*Id.* at 558 (citations omitted). The court concluded that the board of review had acted properly by including the income generated by the landfill operation in valuing the real estate because there had been no recent sale of the property and there were no reliable sales of comparable property. *Id.* at 558–59. The court noted that the *Property Assessment Manual* "appear[ed] to anticipate the use of owner-operator income with respect to owner-occupied and operated real property when insufficient market data exists to provide a reliable basis for extrapolating a market lease rate." *Id.* at 562–63. The supreme court's analysis in *Waste Management* is equally applicable here. In this case, we have no recent arm's-length sales and no recent comparable sales, so evidence of income may be considered. Here, as in *Waste Management*, actual income need not be ignored where the property is owner-occupied and owner-operated.

---

[18] Allright makes similar arguments here.

¶ 45. *ABKA* involved a management contract for condominium units located in the Abbey resort in Lake Geneva. *Id.*, 231 Wis. 2d at 331–32. The assessor included the income from that contract as a part of the value of the Abbey property. *Id.* at 333. ABKA argued that the income was not "inextricably intertwined" with the property because ABKA's unique skill and expertise as rental agent for the resort condominiums allowed it to generate income. *Id.* at 340–41. This argument was, at its essence, a claim that the going concern business value of the management services was improperly included in value of the real estate. Our supreme court rejected those arguments, observing that "the management fees are generated primarily on the resort property itself" and that the Abby resort "possess[es] an inherent capacity to generate income due to its location and access to amenities." *Id.* at 343. The court concluded that the property is "the actual site of income generation" because the rent is generated by the service and amenities provided on the resort property. *Id.* Similarly, Allright's parking lot is the actual site of income generation, which is made possible due to its location (directly across from the airport) and amenities (secure parking on a paved lot and shuttle service to the terminal).

¶ 46. Applying these principles, we conclude that the income appertains to the land and was properly considered in the City's assessment. Allright operates a surface parking lot in a location that will obviously continue to attract customers as long as the airport operates. Operation of the parking lot "is a transferable value that is inextricably intertwined with the land and 'all buildings and improvements thereon.' " *See N/S Assocs.*, 164 Wis. 2d at 55 (quoting WIS. STAT. § 70.03). The City considered the income approach and the cost

approach; as we have seen, both methods of appraisal are authorized by the *Property Assessment Manual.*[19]

¶ 47. Consequently, under WIS. STAT. § 70.03 and controlling precedent, Allright's income from this surface parking lot appertained to the land. The trial court's legal conclusion that the income did not appertain to the land is contrary to controlling Wisconsin law. The trial court's conclusion that the City's appraisal did not conform to the requirements of the *Property Assessment Manual* was incorrect because as we have seen, the approaches the City considered are all authorized by the *Property Assessment Manual.*

### B. Allright's appraisal.

¶ 48. Nicholson never considered the actual income earned by the surface parking lot when he calculated the value of the property, despite having Allright's financial records. Instead, because there were "no leases for parking lots located near General Mitchell International Airport," Nicholson determined what amount of money an owner of real estate elsewhere in Milwaukee County would charge to rent the property to a parking lot operator. The tenant would then run a parking lot on the property. The net income the landowner was estimated to earn by leasing the land to a parking lot operator was then capitalized. Using this method, Nicholson valued the Allright property at $3,400,000.

¶ 49. As we have seen, Nicholson was unable to locate any sales of airport parking lots, or any sales of

---

[19] *See* 1 *Property Assessment Manual* at 9–9, 9–11 ("When comparable sales are not available, the income approach is usually the best method to use to estimate the value of commercial property.") ("The cost approach can be used when valuing properties for which there is inadequate sales information.").

large parking lots which he considered comparable. Nicholson testified that he found earlier sales of vacant land which he considered comparable to the land on which Allright operated its parking lot. Nicholson adjusted for the lack of similarity to the Allright land, and developed a composite of those land values for the purpose of establishing a land value for the Allright land. He then calculated the cost of constructing the existing improvements and structures on the land, deducted an amount attributable to their depreciation, and came to a figure for the value of the buildings and improvements of $911,000. Nicholson's value for the total property based on the cost approach was rounded to $3,300,000.

¶ 50. Nicholson then compared the two methods he used and concluded the value of the Allright property was $3,300,000. However, Nicholson never considered the income that appertained to the land. Such income must be considered in valuing the property.

■■■

¶ 51. Whether income appertains to the land is not, as Allright argues, a determination of expert witness credibility. It is a question of law that we review *de novo*. *See Adams*, 294 Wis. 2d 441, ¶ 26 (court reviewed *de novo* whether city followed the applicable statutes when making assessment). We have held here that the income appertains to the land. Because Allright failed to consider income that appertains to the land, we conclude that Allright failed to present significant contrary evidence necessary to overcome the presumption that the City correctly calculated the value of the subject property. *See Walgreen*, 311 Wis. 2d 158, ¶ 17. Therefore, we reverse the trial court's holding to the contrary.

## IV. Allright's uniformity challenge.

¶ 52. The trial court concluded that the City's assessment should also be rejected because it violated article VIII, section 1 of the Wisconsin Constitution, which provides in relevant part: **"Rule of taxation uniform; income, privilege and occupation taxes.** SECTION 1. *The rule of taxation shall be uniform* but the legislature may empower cities, villages or towns to collect and return taxes on real estate located therein by optional methods." (Emphasis added.) The Wisconsin Constitution has been held to "require[] that the method or mode of taxing real property must be applied uniformly to all classes of property within the tax district." *State ex rel. Levine v. Board of Review*, 191 Wis. 2d 363, 371, 528 N.W.2d 424 (1995). *Levine* explained:

> Under this principle known as the rule of uniformity, taxpayers may demonstrate that although their properties were assessed at fair market value, other comparable properties were assessed significantly below fair market value, thus amounting to a discriminatory assessment of their property. For example, the general underassessment of older properties would constitute discrimination against purchasers of newer properties and, therefore, would violate the uniformity clause of the Wisconsin Constitution.

*Id.* at 371–72 (citations omitted). *Levine* held that where there is evidence that "the assessor admitted that his method of assessment was 'arbitrary' and that it resulted in certain older homes being assessed at a dramatically lower amount than they were traded for on the open market," the assessor violated the rule of uniformity embodied in article VIII, section 1 of the Wisconsin Constitution. *Id.*, 191 Wis. 2d at 371–73.

¶ 53. Similarly, an assessor cannot elect to reassess only a single property (such as a water park) within a class of similar properties (other recently sold commercial properties). *Noah's Ark Family Park v. Board of Review*, 216 Wis. 2d 387, 388–89, 573 N.W.2d 852 (1998). Such conduct is "an improper, arbitrary mode of assessment in violation of the uniformity clause." *Id.* at 393.

¶ 54. Our supreme court has rejected challenges alleging violations of the rule of uniformity where the claim was based on comparing one taxpayers appraised value to the value assigned to an inadequate number of other properties in the assessment district. *See State ex rel. Walthers v. Jung*, 175 Wis. 58, 183 N.W. 986 (1921). *Walthers* explained:

> A taxpayer has no complaint when a valuation which could ordinarily be obtained therefor at private sale is placed upon his property, unless there is such a general undervaluation of the other property of the assessment district as will result in an excessive tax as to him. Such a situation is not shown by proof which compares the valuation of a taxpayers property with less than two percent of the other property in the assessment district.

*Id.* at 61.[20] Relying on *Walthers*, we similarly held that lack of uniformity must be established by showing general undervaluation on a district-wide basis if the subject property has been assessed at full market value.

[20] In *State ex rel. Levine v. Board of Review*, 191 Wis. 2d 363, 528 N.W.2d 424 (1995), our supreme rejected the proposition that *State ex rel. Walthers v. Jung*, 175 Wis. 58, 183 N.W. 986 (1921), requires a challenger in every case "to show that at least two percent of the other properties in the tax district were underassessed." *Levine*, 191 Wis. 2d at 374. Rather, *Levine* explained, *Walthers* "used the two percent figure simply as a

*See State ex rel. Algoma Hous. Co. v. Board of Review*, 166 Wis. 2d 675, 682, 480 N.W.2d 786 (Ct. App. 1991).

¶ 55. In this case, there is no evidence that the assessor singled out Allright's property for assessment. *See Noah's Ark*, 216 Wis. 2d at 388–89. There is also no evidence that the City's assessor used an arbitrary method of assessment for the Allright property. *See Levine*, 191 Wis. 2d at 373–74. Rather, the only evidence upon which the trial court based its conclusion that the uniformity clause had been violated was the opinion of Allright's appraiser, Vitale, who based his opinion on his analysis of particular data.

¶ 56. The trial court's conclusion is based solely on Vitale's analysis of values assigned only to the land component of the real property. Using City assessment records, Vitale calculated the value attributed to land only, on a per-square-foot basis, for the Allright land and for each of seven properties along South Howell Avenue which had the same commercial zoning as Allright's property. Vitale concluded that the assessment was not "uniform" because Allright's per-square-foot land value was significantly higher than the per-square-foot land value of his neighbors. There are several problems with this analysis.

¶ 57. The insignificant number of comparison properties does not demonstrate a constitutional lack of uniformity. The essence of Vitale's method of analysis (comparing the subject property to a small number of other similarly zoned properties) was rejected by our supreme court in 1921. As noted, *Walthers* considered

means of underscoring the inadequacy of the evidence presented by the complaining taxpayer in that case." *Levine*, 191 Wis. 2d at 375–76.

261

whether it was appropriate to permit a challenge to an assessment based on only a small number of examples of lower assessments. *Id.*, 175 Wis. at 60. *Walthers* rejected the proffered method of comparison, noting that if such a method were appropriate, "assessments [would] have a precarious stability, because common knowledge informs us that the average taxpayer can conscientiously testify that his holdings are valued too high in comparison with that of certain of his neighbors." *Id.* at 60–61.

¶ 58. The City of Milwaukee website indicates that it assessed 14,072 commercial properties in the most recent year reported.[21] While neither *Walthers* nor subsequent cases established a bright-line rule detailing how many properties must be compared in a uniformity analysis, case law does establish that taxpayers cannot succeed on a uniformity claim simply by "selectively picking a few low comparison assessments and then complaining that their property was overassessed." *See Levine*, 191 Wis. 2d at 375; *see also Algoma Hous.*, 166 Wis. 2d at 682 (challenger must show general undervaluation on a district-wide basis if subject property has been assessed at full market value). Thus, Vitale's selection of an insignificant number of properties which he claims shows Allright was overassessed does not establish a violation of the uniformity clause.

¶ 59. Comparing the value attributed to only one component of the real property in a uniformity challenge is an analytical method also without support in statutes or relevant case law. Taxes are levied on the

---

[21] *See* http://www.ci.mil.wi.us/AssessmentBaseampCla723. htm (last viewed on Mar. 5, 2009).

value of the real property; not separately on the components of land, or improvements, or other rights or limitations of ownership. *See* WIS. STAT. § 70.01 ("Taxes shall be levied, under this chapter, upon all general property in this state except property that is exempt from taxation. Real estate taxes and personal property taxes are deemed to be levied when the tax roll in which they are included has been delivered to the local treasurer."). As noted previously, WIS. STAT. § 70.03 defines " '[r]eal property,' " " 'real estate' " and " 'land' " as: "not only the land itself but all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto." The *Property Assessment Manual* instructs that "in Wisconsin assessment law real property encompasses the definitions of both real estate and real property." *See* 1 *Property Assessment Manual* at 7–1. WISCONSIN STAT. § 70.32(1) directs the assessor to value "real property" by specific methods described in the statute and in the *Property Assessment Manual.* Section 70.32(2)(a)[22] requires an assessor, af-

---

[22] WISCONSIN STAT. § 70.32(2) provides in relevant part:

The assessor, having fixed a value, shall enter the same opposite the proper tract or lot in the assessment roll, following the instruction prescribed therein.

(a) The assessor shall segregate into the following classes on the basis of use and set down separately in proper columns the values of the land, exclusive of improvements, and, except for subds. 5., 5m., and 6., the improvements in each class:

1. Residential.

2. Commercial.

3. Manufacturing.

4. Agricultural.

5. Undeveloped.

5m. Agricultural forest.

ter fixing a total value on the real property, to segregate the value of the land and the value of the improvements as components of the value of the real property. WISCONSIN STAT. § 70.47(16)[23] allows an owner of real property who is dissatisfied with the valuation to challenge before the board of review *only* the total value of the real property. *See id.* ("Persons who own land and improvements to that land may object to the aggregate valuation of that land and improvements to that land, but no person who owns land and improvements to that land may object only to the valuation of that land or only to the valuation of improvements to that land."). Thus, we find no statutory support for Vitale's claim, or for the trial court's legal conclusion, that uniformity of value is constitutionally required as to the component parts of real property.

¶ 60. The trial court concluded that Vitale's analysis was "reasonable as to the uniformity challenge" stating:

> How can the subject commercial Property be assessed at $25.00 per square foot, while all other surrounding commercial land on Howell Avenue is assessed between $2.50 and $4.00 per square foot, and this Court conclude that the land assessments were uniform? This Court cannot.

■■■

¶ 61. We disagree. As we have held, "[u]niformity does not require equal assessment per square foot of all apartment buildings within a certain area. *Uniformity*

6. Productive forest land.

7. Other.

[23] WISCONSIN STAT. § 70.47(16) applies only to cities of the first class. However, the same language quoted above also appears in WIS. STAT. § 70.47(7).

*requires that the evaluation and the rate of assessment of all properties be uniform."* Algoma Hous., 166 Wis. 2d at 681–82 (emphasis added). The *Algoma Housing* holding is that it is the method of evaluation and the process of assessment, not the dollar amount involved, to which the uniformity requirement is directed. Were we to adopt Allright's novel theory, municipalities and boards of review would be subject to new standards which are not required by statute or the Wisconsin Constitution. We decline to mandate equality of land values for commercially zoned property, as Allright apparently would have us do. Such a dramatic change must be a legislative, not judicial, determination.

¶ 62. The trial court's legal conclusion that the City violated the uniformity clause, based on Vitale's flawed analysis, is inconsistent with relevant statutes and controlling case law. We reverse and remand with instructions that the trial court enter judgment for the City.

*By the Court.*—Judgment reversed and cause remanded with directions.