BONSTORES REALTY ONE, LLC, Plaintiff-Appellant,

v.

CITY OF WAUWATOSA, Defendant-Respondent.

Court of Appeals

*No. 2012AP1754. Submitted on briefs April 2, 2013.
—Decided October 8, 2013.*

2013 WI App 131

(Also reported in 839 N.W.2d 893.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Matthew J. Fleming* of *Murphy Desmond S.C.* of Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Ryan G. Braithwaite* of *Crivello Carlson, S.C.* of Milwaukee and *Amy R. Seibel* of *Seibel Law Offices LLC* of Mequon.

Before Fine, Kessler and Brennan, JJ.

¶ 1. KESSLER, J.   Bonstores Realty One, LLC, (Bonstores) appeals an order of the circuit court which dismissed Bonstores's complaint against the City of

Wauwatosa (the City). Bonstores alleged that the City's property tax assessment on Bonstores's real property was incorrect. The circuit court, in a cogent and thoughtful decision, concluded that Bonstores failed to overcome the statutory presumption that the City correctly assessed Bonstores's property in 2009 and 2010. For the reasons below, we affirm.

## BACKGROUND

¶ 2.  Bonstores is the owner of the Boston Store department store, located at Mayfair Mall, in the City of Wauwatosa. Bonstores acquired this store in March 2006 as a result of its parent company's purchase of a large number of stores throughout the United States from Saks, Inc. (Saks). The purchase of all of the properties totaled over one billion dollars. In tax year 2009, the City assessed the subject property at $25,593,300. Bonstores appealed to the City of Wauwatosa Board of Review, contending that the property's fair market value, as of January 1, 2009, was $11,000,000. The Board upheld the City's assessment. In December 2009, the City issued Bonstores a real property tax bill.

¶ 3.  Pursuant to WIS. STAT. § 74.37 (2009–10),[1] Bonstores brought an action in the Milwaukee County Circuit Court, arguing that the City's 2009 and 2010 tax assessments were excessive. During a trial to the court, Bonstores and the City both presented expert witnesses who testified about their respective valuation method-

---

[1] WISCONSIN STAT. § 74.37 provides:

*Claim on excessive assessment.* (1) DEFINITION. In this section, a "claim for an excessive assessment" or an "action for an excessive assessment" means a claim or action, respectively, by an aggrieved person to recover that amount of general property tax imposed because the assessment of property was excessive.

All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

ologies and their opinions as to the fair market value of the property. Bonstores's expert, Michael Kelly, testified that in his opinion the fair market value of the Boston Store property was $11,000,000. The City's expert, Mark Kenney, testified that in his opinion the fair market value of that property was $27,600,000. The court essentially rejected the values of both experts when it concluded that Bonstores failed to overcome by "significant contrary evidence" the statutory presumption that the subject property had been justly and equitably assessed at $25,593,300, which the court found "represents [the] fair market value of the subject on January 1st of 2009." This appeal follows.

## DISCUSSION

¶ 4.  On appeal, Bonstores argues that:  (1) the circuit court erred by concluding that Bonstores failed to overcome the presumption that the City's assessment was correct; (2) the circuit court erroneously relied on information pertaining to the 2006 acquisition of the subject property, appraisal statements and reports from the firm Cushman and Wakefield, a real estate transfer return, and an appraisal from the firm Ernst & Young; and (3) no evidence supports the circuit court's negative findings regarding Kelly's testimony as to comparable properties. Additional facts will be discussed as relevant to the discussion.

**Standard of Review.**

¶ 5.  Bonstores argues that "[t]he substantial evidence test is the appropriate standard to apply to a challenger's evidence to determine whether the presumption of accuracy [of the assessment] is overcome." However, Bonstores is mistaken. When considering an

excessive assessment claim, the circuit court need not defer to any determination made at a previous proceeding before the board of review. *Allright Props., Inc. v. City of Milwaukee*, 2009 WI App 46, ¶ 12, 317 Wis. 2d 228, 767 N.W.2d 567. Instead, the court must accord the assessor's assessment a presumption of correctness. *Id.* The presumption of correctness does not apply, though, if the challenging party presents "significant contrary evidence[,]" or shows that the assessment "does not apply the principles in the *Property Assessment Manual*." *Adams Outdoor Adver., Ltd. v. City of Madison*, 2006 WI 104, ¶¶ 25, 56, 294 Wis. 2d 441, 717 N.W.2d 803.

¶ 6. On appeal, we defer to the circuit court's findings of fact when resolving conflicting evidence. *Allright Props., Inc.*, 317 Wis. 2d 228, ¶ 13. We will not upset the court's factual findings, including findings involving the credibility of witnesses, unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2); *Lessor v. Wangelin*, 221 Wis. 2d 659, 665–66, 586 N.W.2d 1 (Ct. App. 1998). In particular, it is within the province of the factfinder to determine the weight and credibility of expert witnesses' opinions. *Bloomer Housing Ltd. P'ship v. City of Bloomer*, 2002 WI App 252, ¶ 12, 257 Wis. 2d 883, 653 N.W.2d 309. Conversely, application of the law to the facts presents a question of law which we review *de novo*. *Allright Props., Inc.*, 317 Wis. 2d 228, ¶ 13. Thus, we independently review whether a valuation complied with the statutes and the Wisconsin Property Assessment Manual. *See id.*

**The Presumption is not "overcome" just because contrary evidence (even "substantial" contrary evidence) is presented.**

¶ 7. WISCONSIN STAT. § 70.49(1) requires a municipal assessor to attach a particular affidavit to the

completed assessment role when she reports her conclusions of assessed values. Thereafter each assessment "shall, in all actions and proceedings involving such values, be presumptive evidence that all such properties have been justly and equitably assessed." WIS. STAT. § 70.49(2).

¶ 8. WISCONSIN STAT. § 903.01 describes, generally, how presumptions are handled in civil cases. The statute provides:

> **Presumptions in general.** Except as provided by statute, a presumption recognized at common law or created by statute, including statutory provisions that certain basic facts are prima facie evidence of other facts, imposes on the party relying on the presumption the burden of proving the basic facts, but once the basic facts are found to exist the presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.

The 1974 Judicial Committee Notes explaining the statute's adoption explain why Wisconsin rejected the approach to presumptions which Bonstores advocates:

> The Model Code of Evidence (1942) . . . adopted the "bursting bubble" theory of presumptions . . . under which a presumption vanishes upon the introduction of evidence which would support a finding of the nonexistence of the presumed fact . . . .
>
> Under the Model Code, the jury was not to learn of the presumption for it was a tool exclusively used by the judge. Its procedural effect was to shift the burden of producing evidence (not persuasion) of the nonexistence of the presumed fact to the party against whom the presumption operates . . . . When the presumed fact was essential, the judge determined whether that burden had been met upon motions for nonsuit or directed verdict.

445

The Uniform Rules of Evidence (1953) . . . accepted . . . with respect to presumptions derived from facts which have probative value as evidence of the existence of the presumed fact (presumptions "based upon logic" or "grounded upon reasonable inference"). The burden of persuasion as well as the burden of producing evidence was shifted, and although rebutting evidence had been produced, the inference from the presumption survived and was sufficient to support a jury verdict, and the jury was to be instructed with respect to the presumption and told that it shall stand until met by evidence of equal weight . . . .

[WISCONSIN STAT. § ]903.01 accords to presumptions based on policy the same effect as those based upon logic or reasonable inference by shifting the burden of persuasion as well as the burden of producing evidence. The section effectuates a major change in Wisconsin law.

. . . .

The Model Code adopted the . . . view that inconsistent presumptions cancelled each other. Because the Uniform Rules shift the burden of persuasion with respect to some presumptions, but not others, it was necessary to promulgate Uniform Rule 15 dealing with inconsistent presumptions. Because presumptions under s. 903.01 would have equal procedural effect in civil cases, and under s. 903.03 would have equal procedural effect in criminal cases, there is no provision in these sections for the treatment of inconsistent presumptions. Should inconsistent presumptions be established in a case, the weight of the evidence establishing the facts upon which the presumptions are premised is for the trier of the fact and not to be dealt with by the judge in the discharge of his function with respect to the law.

■

¶ 9. Once the presumed fact (the assessed value) is established, WIS. STAT. § 903.01 shifts the burden of producing evidence to the *opponent* of the presumed

fact—here to Bonstores—to produce evidence that it is more probable than not that the assessed value is not correct. The presumption (that the City assessed value is correct) does not disappear simply because contrary evidence exists. Although the burden of producing evidence shifts, the burden of persuasion never leaves the proponent of the presumption. Professor Daniel D. Blinka explains:

> [Wisconsin Stat.] § 903.01 provides that the party relying on the presumption . . . has the burden of proving the *basic* facts. As used in the rule, the term "burden" refers unambiguously to both the burden of production and the burden of persuasion. Satisfying the burden of production allows the proponent to put the presumption before the trier of fact for consideration. The presumption is not operative, however, unless the proponent convinces the trier of fact as to the existence of the *basic* facts by a preponderance of the evidence, i.e. satisfies the burden of persuasion.

7 Daniel D. Blinka, *Wisconsin Practice Series: Wisconsin Evidence,* § 301.4 at 81 (3rd ed. 2008). The trier of fact retains the obligation to weigh the competing evidence, including the presumption, and to determine whether the presumed fact is more probable than not.

¶ 10. Because both parties agreed that the property was assessed at $25,593,300, the City has met its burden of establishing the presumptive fair market value of the property. For Bonstores to challenge this assessment, it is required by Wis. Stat. § 903.01 to present sufficient evidence to persuade the circuit court that $25,593,300 is probably not the fair market value of the property. A failure to provide sufficient persuasive evidence that this amount is probably not the fair market value would entitle the City to judgment based on the statutory presumption. *See* Wis. Stat. § 70.49(2).

447

The first step in our analysis, then, is to determine whether Bonstores overcame the presumption in favor of the assessor's valuation. If not, our inquiry ends and we will sustain the assessed valuation. *See State ex rel. Campbell v. Township of Delavan*, 210 Wis. 2d 239, 262, 565 N.W.2d 209 (Ct. App. 1997) (question of whether credible evidence supports assessor's valuation only reached if presumption in favor of assessor's valuation has been overcome). The circuit court, as the trier of fact, is the ultimate arbiter of the weight and credibility of the evidence and of any reasonable inferences drawn from that evidence. *U.S. Oil Co., Inc. v. City of Milwaukee*, 2011 WI App 4, ¶ 11, 331 Wis. 2d 407, 794 N.W.2d 904 (Ct. App. 2010). We may not consider whether the evidence might support a contrary conclusion, or a contrary inference that is reasonable. *See Morden v. Continental AG*, 2000 WI 51, ¶ 39, 235 Wis. 2d 325, 611 N.W.2d 659. We therefore examine the record as a whole to determine whether evidence, and reasonable inferences therefrom, support the court's conclusion.

¶ 11. Here, the circuit court weighed the evidence, considered the credibility of the opinions expressed, and was not persuaded that Bonstores had established that it was more probable than not that the assessed value was not correct. To reach that conclusion, the court necessarily did not find persuasive Bonstores's appraiser's opinion that the fair market value of the subject property was $11,000,000. The circuit court specifically found that "the assessor here made a just, equitable assessment" of the property and that "the value found by the assessor, $25,593,300, represents [the] fair market value of the subject [property] on January 1st of 2009."

448

**Evidence supports the circuit court's conclusion that the City's appraisal was just, equitable and represents the market value of the subject property.**

¶ 12.   Both parties presented hundreds of pages of evidence and hours of testimony, in which witnesses expressed a wide range of opinions as to the value of the subject property based on various appraisals employing a variety of methods. These witnesses disputed or corroborated various facts or methodologies of other opinions expressed at various times as to the fair market value of the subject property.

¶ 13.   WISCONSIN STAT. § 70.32(1) sets forth the requirements for the evaluation of real property and requires assessors to follow the mandates outlined by the Wisconsin Property Assessment Manual. The statute provides:

> Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's-length sales of reasonably comparable property; recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.

¶ 14. We explained the three-tier hierarchy described in the assessment manual that must be applied to determine the fair market value of property for tax assessment:

> The [Wisconsin Property Assessment Manual] and case law set forth a three-tier assessment methodology to determine a property's full value. Evidence of an arm[']s-length sale of the subject property is the best evidence of true cash value. [Tier 1] If there has been no recent sale of the subject property, an assessor must consider sales of reasonably comparable properties. [Tier 2] *Only if there has been no arm[']s-length sale and there are no reasonably comparable sales may an assessor use any of the third-tier assessment methodologies.* [Tier 3][.]

*Allright Props., Inc.*, 317 Wis. 2d 228, ¶ 11 (citing *Adams*, 294 Wis. 2d 441, ¶ 34) (some formatting altered; emphasis added; five sets of brackets in *Allright Props., Inc.*). The Wisconsin Property Assessment Manual identifies valuation techniques generally applicable to commercial property by explaining that "[e]stimates of market value can be derived by using the cost, income and/or sales comparison approaches. Commercial property can be valued by either single property or mass appraisal techniques." *Wisconsin Property Assessment Manual* at 9–5.

¶ 15. None of the appraisers that testified considered the 2006 purchase of this store in the bulk sale by Saks (allocating the $32.7 million purchase price financed and reported for the subject property) to be an arms-length tier one sale. The City's appraiser concluded that a tier two analysis of comparable sales was possible, and resulted in a value of $27,600,000. Bonstores's appraiser applied a tier three analysis and

concluded the value of the subject property was $11,000,000. We discuss the appraisals separately.

## A. Bonstores's Appraiser Michael Kelly.

██

¶ 16. Bonstores's expert witness, Michael Kelly,[2] relied primarily on an income capitalization approach, which he based on his belief that the retail sales (actual or estimated) of "anchor department stores" was "the most important factor affecting the value of the subject property." Kelly acknowledged that the amount of retail sales by a particular business is the result of many factors that are unrelated to the real estate. However, he saw no need to separate the impact of the real estate from the impact of management, product and other factors which contribute to the store's retail sales. Kelly also conducted a "sales comparison approach," which likewise relied on retail sales (actual or estimated) on comparable properties, and a "cost approach."

¶ 17. Kelly fundamentally relied on determining "stabilized" retail sales generated on property he selected as comparable for both his income capitalization and sales comparison approaches. Kelly explained in his report why he "stabilized" sales:

> A sale can occur in an otherwise successful mall if a particular anchor has a product line that is unsuitable for the local market and causes low retail sales for that particular occupant . . . . [T]he buyer will look not only at the retail sales of the prior occupant but also at the sales of the other more successful anchors in that same mall . . . .

---

[2] Kelly had 37 years of appraisal experience. He was a Member of the Appraisal Institute, (MAI) and held a Society of Real Property Appraisers designation.

The other event that can occur is the parent company of a regional or national retailer filing bankruptcy and closing all their stores. When the property is put on the market, the buyer will look at the historical sales of the closed store. However, his prime consideration will be what the retail sales were of the other successful stores in the mall . . . .

In any event, the buyer will base his purchase price on his projection of what retail sales will be on a stabilized basis taking into consideration not only the sale property's historical sales but those of the other anchors in the same mall.

¶ 18. Kelly's report explained the "Sales Comparison Approach" he used:

Because of the location differences, we have also analyzed the retail sales per square foot for the subject and each of the sale properties . . . .

As a check on the sale property's viability as a retail store, the retail sales of the other anchors in the same mall are also analyzed and compared to the sale properties.

¶ 19. Of the eight stores used as comparable properties, Kelly described six as "inferior." (Yonkers in Eau Claire; Yonkers in Racine; JC Penny in Bloomingdale, Illinois; Lord & Taylor in Columbus, Ohio; Marshall Fields in Columbus, Ohio; and Saks in Dearborn, Michigan). Two of his comparable stores—Jacobson in Ann Arbor, Michigan, and Jacobson in Livonia, Michigan—were sold in a bankruptcy auction in September 2002. The Ann Arbor store shut down in January 2002. Kelly chose to "stabilize" the retail sales for that Jacobson store prior to the sale by calculating the retail sales per square foot of three other anchor stores in the mall—JC Penny, Marshall Fields, and Sears—"and in other Mid-

west markets" to arrive at a retail sales figure to apply to Jacobson. The Jacobson property was treated with the same sales stabilization technique as its sister store. Kelly concluded that the 2001 Livonia Jacobson sales were too low because of "knowledge that the store was to close and the infrequency of new supplies entering the store." He therefore applied to Jacobson a figure for the retail sales per square foot in 2001 based on the other anchor store in that mall—Parisian—and sales per square foot from "other Midwest markets." In his summary of adjustments Kelly considered none of the properties superior to the subject property, the two bankrupt properties "similar overall" to the subject property, and the six other properties "inferior" to the subject property.

¶ 20.  The circuit court expressed substantial skepticism about Kelly's appraisal methods. Specifically, the circuit court noted that Kelly's reliance on retail sales and his belief that all other considerations—location, store size, etc.—were included in retail sales such that normally required adjustments of comparable properties did not have to be made. This view did not "allow for changes in product line, quality of management [and] brand name." All of these changes, the circuit court noted, are fundamental aspects of a retail department store which have a direct impact on retail sales, regardless of where the store is located or whether the property is owned or leased by the department store. The court concluded that by "resorting to other market sources" rather than "actual sales from the [comparable] property" when the "comparable" store had very low sales, had gone out of business or had moved away, Kelly "contrived an artificial figure which is insulating you from the realities of the market."

¶ 21.  The circuit court also expressed concern over Kelly's "Sales Comparison Approach." The court explained that it did not "see the apples-to-apples comparison" between the subject property and the properties Kelly relied on as comparable, and concluded that Kelly did not provide meaningful comparable properties because many of the properties had gone "dark." Kelly defined "dark" as "a period of time where the store is not operating." The circuit court stated:

> [Kelly] had eight properties, seven or eight properties . . . and a majority of them were stores that had gone dark. A couple of them were bankruptcy auctions. And interestingly too, I think only two of them were found comparable to the subject. All the rest were deemed inferior to the subject . . . .
>
> This use of properties which have gone dark or which have gone into bankruptcy also results in a higher capitalization rate. A capitalization rate is a measure of risk associated with the asset. The higher the risk, the higher the capitalization rate. And [Kelly's] comparables . . . were all distressed in one way or another.

¶ 22.  Bonstores concedes, to some degree, that some of the comparable properties relied upon by Kelly were "distressed." In an intricate parsing of language, Bonstores argues that "none of the comparables . . . upon which Mr. Kelly placed any *significant* reliance were 'distressed.'" (Emphasis added.) Thus, Bonstores effectively admits that at least some of the comparable properties were fairly characterized as "distressed." Kelly confirmed that a store going "dark" may have a significant impact on the property. It appears from the record that the circuit court used the phrase "distressed property" to refer to a "dark" business. Kelly agreed that the subject property is not a "dark" store, has never gone dark, and there is no evidence it would go dark and be

sold off as a single property. As such, the circuit court did not erroneously determine that Kelly's reliance on the sales of properties he deemed comparable was unreliable.

¶ 23. Moreover, the circuit court's skepticism of Kelly's use of retail sales to value real estate reflects our supreme court's holding in *ABKA Limited Partnership v. Board of Review of The Village of Fontana-On-Geneva Lake*, 231 Wis. 2d 328, 603 N.W.2d 217 (1999). The court explained that when inquiring into the income producing capacity of the land, "[i]ncome that is attributable to the land, *rather than personal to the owner,* is inextricably intertwined with the land and is thus transferrable to future purchasers of the land. This income may then be included in the land's assessment under WIS. STAT. § 70.03 because it appertains to the land." *ABKA Ltd. P'ship*, 231 Wis. 2d at 336 (emphasis added; internal citations omitted). Examples of business inextricably linked to the land may be seen in *State ex rel. N/S Assoc iates v. Board of Review of The Village of Greendale*, 164 Wis. 2d 31, 473 N.W.2d 554 (Ct. App. 1991) (Southridge Mall's business of leasing space to tenants is a transferrable value inextricably linked to the land), and *Waste Management of Wisconsin v. Kenosha County Board. of Review*, 184 Wis. 2d 541, 568, 516 N.W.2d 695 (1994) (income from landfill attributed to inherent capacity of the land to accept waste).

¶ 24. Here, the record describes nothing specific to the land that appertains to Bonstores management's capacity to sell department store goods. The circuit court properly rejected Kelly's reliance on retail sales of department store goods as a significant factor in determining the value of the real estate where the department store is located.

## B. City's Appraiser Mark Kenney.

¶ 25. The City's expert appraiser,[3] concluded that the market value of the fee simple estate in the subject property was $27,593,300. Kenney opined that the subject property itself was worth approximately $25.6 million, but that the property had "surplus land" which added an additional $2,000,000 to the total value. Specifically Kenney stated that the "market value represents a 100% interest in real property alone. No value attributable to personal property or business enterprise is included in the . . . market value."

¶ 26. Kenney did a traditional tier two sales comparison approach. He explained how he applied this approach:

> [T]he market value of the subject property can be estimated by first comparing it to comparable sale properties. Once the major differences between the subject and each of the sale properties are identified, the controlling factors such as location, building size, age/condition, construction design and quality, building coverage ratio, income quality, market demand, overall investment return, etc., are weighed in order to evaluate the value attributes and risk elements of each sale versus the subject.

¶ 27. Kenney noted that the Wisconsin Property Assessment Manual points out that "[t]he location for a retail store is of extreme importance." Kenney concluded that the highest and best use of the subject property was an uninterrupted use as an anchor department store. The parties stipulated that "Mayfair Boston Store is one of Bon Ton's best performing stores." Kenney concluded that large department stores and big box sales were the

---

[3] Kenney is also a licensed appraiser and a Member of the Appraisal Institute.

most comparable to the subject property. He did not include in his comparable properties any conversion, redevelopment or "dark store" sales because they have a different highest and best use than the subject property. Considering sales of comparable properties *after* the valuation date is permitted by the Uniform Standards of Professional Appraisal Practice in a retrospective valuation. Because this valuation is to determine a value at a date already past, it is a retrospective valuation.

¶ 28.　Kenney compared sales of thirteen large department stores or big box stores around the United States. The sales closed between May 2006, and June 2010. He also considered two Boston Stores in Wisconsin acquired from Saks in the 2006 transaction. He explained that, as authorized by the Wisconsin Property Assessment Manual, he compared sales of the properties on the basis of the sale price per square foot of the gross leasable area. As to each of the comparable sales, Kenney noted the financial terms of any applicable lease[4] and any additional expenses related to the property. Kenney made adjustments to the sale price per square foot of the compared sales to make them more similar to the subject property. He did this after considering "ownership interest transferred, financing, conditions of sale, market conditions, location, building size, age/condition, construction quality/number of stories, economic characteristics, building coverage ratio, market area and other features."

¶ 29.　Kenney ultimately concluded that the market value of the property was approximately $25.6 million and that surplus land added an additional $2,000,000 to the market value.

---

[4] Kenney did not consider the lease Bonstores had with its parent company because he did not consider that lease an arm's-length transaction.

¶ 30. Kenney obtained similar values in considering the same tier three approaches Kelly used. Kenney did a direct income capitalization analysis. Kenney reviewed market rents at sixteen big box or anchor department stores in Wisconsin and around the country which he considered generally comparable to the subject property. The lease amount paid by each lessor (income from the land), was reduced by other occupancy expenses incurred by the landlord to determine a net operating income per square foot of leased property. The net operating income attributable to both the building and the surplus land was then capitalized at the rate of 7.40%. This rate was selected based on Kenney's comparison of the capitalization rates from the comparable sales when enough information was available. Capitalizing the net operating income at 7.40% produced a value of $24,210,297 for the building and related parking and $2,014,650 for the surplus land, for a total value of the subject property of $26,224,947. Kenney rounded this to $26,200,000.

¶ 31. Kenney also did a cost approach analysis. Essentially this approach considers what it would cost to reproduce the existing property—land and building. He determined the value of the land as though vacant based on sales of comparable land. Then he calculated the estimated cost of reproducing the existing building. The two values are added together, which resulted in a value of $29,300,000 as of January 1, 2009, under the cost approach.

¶ 32. Kenney reconciled the tier three approaches, as required by the Wisconsin Property Assessment Manual, to test the reasonableness of his value based on the tier two comparable sales approach. He adopted his comparable sales value, $27,600,000, as the fair market value of the subject property. In reaching its decision

458

affirming the Board, the circuit court noted that Kenney's tier two appraisal figure, before the addition of the value of the surplus land, very closely matched that of the Board.

**Evidence of other appraisals involving this property, and public representations of its value by Bonstores executives, were relevant and properly considered.**

¶ 33. Bonstores argues that the circuit court should not have either considered or "relied upon" a variety of other evidence regarding the value of the subject property for various purposes at various times. Specifically, Bonstores argues that the 2006 purchase price and an appraisal report from Cushman and Wakefield were irrelevant and should not even have been considered by the circuit court.[5] To the extent Bonstores objected to this evidence at trial, the record indicates that the objections were based solely on relevance. We "will not disturb a circuit court's decision to admit or exclude evidence unless the circuit court erroneously exercised its discretion." *Weborg v. Jenny*, 2012 WI 67, ¶ 41, 341 Wis. 2d 668, 816 N.W.2d 191. A circuit court erroneously exercises its discretion if it applies an improper legal standard or makes a decision that is not reasonably supported by the facts in the record. *Id.* When the circuit court sits as factfinder, it is

---

[5] Bonstores also argues that the circuit court erroneously relied upon an appraisal report from Ernst & Young; however, Bonstores does not dispute the City's assertion that Bonstores failed to object to the admission of this evidence. As such, Bonstores has not preserved the issue of the circuit court's "reliance" on the Ernst & Young report for appeal. However, we find no evidence that the circuit court "relied upon" the Ernst & Young report.

the ultimate arbiter of the weight and credibility afforded to the evidence. *Kersten v. H.C. Prange Co.*, 186 Wis. 2d 49, 56, 520 N.W.2d 99 (Ct. App. 1994). The circuit court did not erroneously exercise its discretion in admitting and considering the challenged evidence. We address each category below.

## A. The public report of the purchase price of $32,700,000 for the subject property.

■

¶ 34.   Paul Ruby, the senior vice president of Bon Ton Department Stores, Inc., confirmed that $32.7 million was the amount Bonstores actually paid for the subject property and that Bonstores recorded that amount on the real estate transfer return it filed with the Milwaukee County Register of Deeds. Ruby testified that the retail sales that a particular store generates are based significantly on the operations, the business aspect of a store. He also testified that generally the only time Bon Ton would sell a single store is when the store is underperforming, with a long history of underperforming or losing money. Ruby also testified that Bon Ton stores are currently paying rent at approximately five percent of retail sales, although his goal is to pay rent in the amount of two to three percent of retail sales.

¶ 35.   The circuit court observed that the public filing was "telling the world" that the purchase price of the subject property was $32,700,000 and, as such, could not simply be ignored. It contributes to the range of values that have been stated for the subject property at various times by responsible people. Various opinions as to the value of the property in 2006 provide at least some context to consider in determining whether either party has presented a preponderance of evidence of the fair market value of the property on January 1, 2009.

¶ 36. In the long discussion by Kelly of rent as a percentage of a store's retail sales, which he considered relevant to his opinion of the value of the property, he argued that a range of two to three percent was appropriate based on various data he considered. Ruby's testimony as to what Bonstores was actually paying, which was considerably higher than Kelly's figure, was relevant to the court's obligation to determine the weight and credibility of the opinion evidence presented.

**B. The 2006 acquisition and The Cushman & Wakefield Appraisal.**

██

¶ 37. The circuit court found that an appraisal Cushman & Wakefield did for Saks was used in 2006 by Bon Ton Stores to obtain a loan for $1.185 billion from Bank of America to finance the purchase from Saks of 142 stores. Bon Ton obtained mortgage financing within that loan in the sum of $260 million, of which $32.7 million was attributed by Cushman & Wakefield to the Wauwatosa property. Neither party claimed that the 2006 interrelated transaction between Bonstores and the Saks entity was an arm's-length sale.

¶ 38. The significance of this appraisal was that Bonstores relied on it when it represented in a public document (the Real Estate Transfer Return) that the value of the subject property was $32,700,000. That representation in 2006 was $21,200,000 more than the $11,000,000 value Bonstores claimed was the value in 2009 in this litigation, and approximately $7,100,000 more than the City's claimed value at the same time. The appraisal was relevant for the court to consider in the context of determining both the credibility of Kelly's appraisal and whether Bonstores had produced a pre-

ponderance of evidence that that the City's appraisal at $25,593,300 was incorrect.

## CONCLUSION

¶ 39. For the foregoing reasons, we affirm the circuit court.

*By the Court.*—Order affirmed.

¶ 40. FINE, J., *(concurring)*. In my view, the majority overcomplicates the analysis of state-court presumptions in Wisconsin. WISCONSIN STAT. RULE 903.01 is clear:

> Except as provided by statute, a presumption recognized at common law or created by statute, including statutory provisions that certain basic facts are prima facie evidence of other facts, imposes on the party relying on the presumption the burden of proving the basic facts, but *once the basic facts are found to exist the presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.*

(Emphasis added.) *Quod erat demonstrandum.* Nothing more needs to be said or written.[1] I agree with the circuit court and the Majority that Bonstores Realty One, LLC, has not overcome the presumption in favor of the assessment.

---

[1] The federal rule is, of course, different:

> In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.

FED. R. EVID. 301.