¶ 74.
SHIRLEY S. ABRAHAMSON, J.
0dissent-ing). Fortunately for Regency West (and unfortunately for Racine's coffers and the other Racine taxpayers), the majority opinion declares that the lower assessment of the property at issue is correct. The majority opinion flouts the longstanding principle that property tax assessors should use the best information possible in order to determine real property's full value, upends the proper scope of appellate review, and inserts itself as a fact-finder. Because of the majority opinion's unwarranted departures from precedent and usurpation of the role of the circuit court, I dissent.
*316 ¶ 75. The essential question posed in this court is whether Racine's original assessments are excessive. The circuit court, the court of appeals, and I answer the question in the negative. Applying a correct legal analysis, giving deference to the circuit court, the fact-finder, and reviewing the record compel answering the question with a firm, clear "No."
¶ 76. The majority opinion reaches the opposite answer, resting its conclusion on errors of law and on its refusal to consider the evidence Racine presented. Now, assessors of federally subsidized housing (at least Section 42 housing) apparently can go straight to an income approach, a third-tier method of assessment, bypassing the best information and other proper assessment methodologies along the way.
I
¶ 77. Regency West, the property at issue, comprises 72 apartment units and is owned by a limited liability corporation. The property is treated as commercial property for assessment purposes. Wisconsin Property Assessment Manual 9-1 (2011) [hereinafter Manual] ("For assessment purposes commercial property consists of. . . [a]partment houses of four or more units . . . ."). Although the majority opinion describes Regency West as residential property, the majority opinion applies the commercial valuation principles set forth in the Manual.[1]
¶ 78. I agree with the majority opinion that general appraisal principles apply to federally subsidized housing. I agree with the majority opinion that the three valuation approaches are an arm's-length sale of the subject property (tier one), the sales comparison *317 approach (tier two), and income, cost, and other valuation methods (tier three).[2]
¶ 79. I agree with the majority opinion that the statutory interpretation and application of Wis. Stat. § 70.32 presents a question of law that this court determines independently. The court determines, as a matter of law, whether the assessor's valuation methodology complies with statutory requirements. Here our agreement ends.
¶ 80. I disagree with the majority opinion that, as a matter of law, the only valuation approach applicable in the instant case is the income approach. The majority opinion errs as a matter of law.
¶ 81. The majority opinion errs as a matter of law when it totally discards and disregards in its analysis the evidence presented by Dan Furdek and Peter Weissenfluh, Racine's expert witnesses. The majority opinion describes Furdek and Weissenfluh's evidence, but does not consider the evidence in its analysis and conclusion.
¶ 82. Why ignore these experts? One reason is "because," according to the majority opinion, "their appraisals exceeded the valuations of Racine for both 2012 and 2013." Majority op., ¶ 57 n.19.[3] A second reason for ignoring Racine's two experts, according to *318 the majority opinion, is that they err as a matter of law in using a sale comparison approach to valuation in the instant case.
¶ 83. The majority opinion supports its legal conclusion that Racine's two experts should be ignored in their entirety in footnote 19, citing Trailwood Ventures, LLC v. Village of Kronenwetter, 2009 WI App 18, ¶¶ 12-13, 315 Wis. 2d 791, 762 N.W.2d 841. The footnote in the majority opinion states:
We do not consider the appraisals of Peter Weissenfluh and Dan Furdek because their appraisals exceeded the valuations of Racine for both 2012 and 2013. See Trailwood Ventures, LLC v. Vill. of Kronenwetter, 2009 WI App 18, ¶¶ 12-13, 315 Wis. 2d 791, 762 N.W.2d 841 (concluding that a taxation district that has accepted the payment it requested has agreed that its taxation value is the maximum value that it may seek; Wis. Stat. § 74.37 permits a refund to the taxpayer or may uphold the status quo, but there is no authority for deficiency judgments).
¶ 84. The Trailwood Ventures case does not support the conclusion of law (reached by the majority opinion) that a court cannot or should not consider evidence presented that the value of the subject property was greater than the assessment from which review was sought. The Trailwood Ventures decision says nothing about admissible evidence or disregarding evidence that the value of the subject property was greater than the original assessment. The briefs filed in Trailwood Ventures, as well as the opinion, make clear that admissibility of evidence was not an issue in Trailwood Ventures.
¶ 85. Trailwood Ventures holds only that the statutes do not permit a trial court to set a higher assessment under Wis. Stat. § 74.37 than that from *319 which the taxpayer appealed or impose a greater tax burden on the taxpayer than the one the taxpayer challenges. Trailwood Ventures, 315 Wis. 2d 791, ¶¶ 10, 12-14.
¶ 86. Trailwood Ventures offers no guidance in the instant case. Racine's purpose of introducing its experts' evidence was not to increase Regency West's assessments for 2012 and 2013 or to levy a larger tax on Regency West for those years. Furdek and Weissen-fluh's evidence was to serve the singular purpose of showing that Racine's initial assessments were not excessive. In misapplying Trailwood Ventures, the majority opinion commits a fatal error of law by utterly ignoring the evidence presented by Racine's two expert witnesses.
f 87. The majority opinion is off on its own solo venture in discussing Trailwood Ventures. Regency West has made no objection to the admission of Furdek and Weissenfluh's testimony on the ground that their valuation was higher than Racine's initial estimate. Neither party's briefs in the instant case cite or discuss Trailwood Ventures. The majority opinion misinterprets and misapplies Trailwood Ventures to make new law in the instant case.
f 88. A second reason the majority opinion errs as a matter of law in deciding that only the income method of valuation applies and in discarding the evidence of Weissenfluh and Furdek is that the majority opinion concludes that the sales comparison approach was not a valid appraisal method in the instant case. The majority opinion takes a cribbed, too narrow view of the sales comparison approach. (Weissenfluh and Furdek also used an income approach.)
¶ 89. The majority opinion misreads the directive in the Manual that "the recent arm's-length sales *320 [of federally subsidized housing] should have restrictions similar to the subject property." Manual at 9—52 (emphasis added). The majority opinion reads "similar" to mean "identical" and concludes that Racine's two experts' comparable sales approach was erroneous.
f 90. The second tier method of valuation, the sales comparison approach, requires an assessor to use the value of "reasonably comparable" properties. " '[Reasonable comparability' depends upon the degree of similarity between the properties in question." Rosen v. City of Milwaukee, 72 Wis. 2d 653, 686, 242 N.W.2d 681 (1976). The court has suggested some factors to consider in determining the similarity of properties:
Important considerations in determining whether particular property is sufficiently similar to the property being assessed to warrant reliance on its sale price as evidence of market value include its location, including the distance from the assessed property, its business or residential advantages or disadvantages, its improvements, size and use. It is also important to consider the conditions of sale, including its time in relation to the date of valuation, and its general mode and character insofar as they tend to indicate an arm's-length transaction.
Rosen, 72 Wis. 2d at 665.
f 91. The Manual at 9-12 provides that the "sales comparison approach should be used" if there are comparable properties, and that "[t]o be comparable, properties should be similar in both physical and economic characteristics including. . . the ability to generate income . . . ."
*321 f 92. The Manual contains a section devoted to subsidized housing, including Section 42 housing.[4] The Manual describes 10 different types of federally subsidized housing. Regarding Section 42 housing, the Manual notes that these projects' operating income is often lower than market rate properties and that these projects can be risky because of tenant income restrictions.[5] The Manual addresses generally how to assess the 10 different federally subsidized projects. Case law and the Manual make clear that assessors must consider the impact that the subsidized housing's restrictions have on value.
¶ 93. Nothing in the Manual's subsection addressing federally subsidized Section 42 housing discusses any limitations on the type of assessment methodology that should be used in assessing these properties. The Manual does not foreclose using sales comparison to value subsidized housing, although the majority opinion reads the Manual as if it does. Indeed, the Manual refers to using the sales comparison approach in determining the proper method of valuation for federally subsidized housing. See Manual at 9-52. The Manual does state that "the income approach may be the most useful method for valuing subsidized housing . . . ." See Manual at 9-53. The operative word is "may."
¶ 94. As to using the sales comparison approach, the Manual explains that a comparable property should have restrictions similar to the subject property and information should be sought from several sources. The Manual states:
*322 To be considered comparable, the recent arm's-length sales should have restrictions similar to the subject property. The assessor may have to perform a statewide search to find comparable sales. Sales data should always be confirmed by reliable sources. Information may be obtained by viewing website data and by calling other assessors who have similar subsidized housing in their jurisdictions.
Manual at 9-52.
¶ 95. The evidence presented by Furdek and Weissenfluh adheres to the Manual. They considered the impact of the Section 42 restrictions in their sales comparison valuation. I will comment further on their evidence later on. For now, I just point out that the majority opinion errs in disregarding out of hand the sales comparison approach in the instant case.
¶ 96. In sum, the majority opinion is based on errors of law regarding the interpretation and application of the three tiers of valuation and in entirely disregarding Furdek and Weissenfluh's evidence. The majority opinion relies only on Racine's assessor, Janet Scites, and Racine's Chief Assessor, Ray Anderson.
¶ 97. I turn to the standard of review of the evidence in the record. I then analyze the testimony of the competing experts and review the circuit court's findings of fact and determination under the proper standard of review.
II
¶ 98. Having determined that Racine's experts complied with the statute and the Manual in using several methods of valuation, I now determine whether Racine's original assessments were excessive. A challenger, here Regency West, has the burden at *323 trial to "produce evidence that it is more probable than not that the assessed value is not correct." Bonstores Realty One, LLC v. City of Wauwatosa, 2013 WI App 131, ¶ 9, 351 Wis. 2d 439, 839 N.W.2d 893. Racine may rebut with its own evidence Regency West's production of evidence.
¶ 99. The circuit court's findings of fact will not be overturned by an appellate court unless they are clearly erroneous, that is, unless they are against the great weight of the evidence. Findings of fact are not against the great weight of the evidence "merely because a different fact-finder could draw different inferences from the record." State v. Wenk, 2001 WI App 268, ¶ 8, 248 Wis. 2d 714, 637 N.W.2d 417.
f 100. Further, the weight and credibility that an appellate court gives to the evidence of an expert witness is also "uniquely within the province of the fact finder." Bloomer Housing Ltd. P'ship v. City of Bloomer, 2002 WI App 252, ¶ 12, 257 Wis. 2d 883, 653 N.W.2d 309 (quoted source omitted). "Where, as here, there is conflicting testimony, the fact finder is the ultimate arbiter of credibility and when more than one reasonable inference can be drawn, the reviewing court must accept the inference drawn by the trier of fact." Bloomer, 257 Wis. 2d 883, ¶ 12 (internal quotation marks omitted); see also Mineral Point Valley Ltd. P'ship v. City of Mineral Point Bd. of Review, 2004 WI App 158, ¶ 16, 275 Wis. 2d 784, 686 N.W.2d 697 (Deininger, P.J., concurring) ("I recognize that, in the absence of a recent arms-length sale, property valuation depends largely on matters of judgment and expertise. . . . [Ajppraised values of a particular property can differ sharply, and [ ] it is most often the fact finder's proper role to assess the weight and credibility of competing opinions of fair market value.").
*324 III
¶ 101. Following a four-day bench trial filled with extensive expert evidence from both sides, the Circuit Court for Racine County concluded that the original assessments were not excessive.
f 102. The crux of the circuit court's decision involved determining the weight and credibility of conflicting expert evidence. Each side presented experts and, as the circuit court explained, "[t]he opinions provided by all experts in this case [were] highly subjective. All experts stabilized values, loaded cap rates, or made adjustments to factors used in calculating their valuations based on their experience and for reasons stated in their testimony."
¶ 103. Ultimately, the circuit court concluded (and the court of appeals agreed) that Racine's experts were more credible and more persuasive. Based on this determination, the circuit court concluded that Racine's original assessments were not excessive. The court of appeals affirmed.
¶ 104. Deferring to the circuit court's findings of fact about the credibility of the expert witnesses and the weight to be given to each of them, I agree with the circuit court's conclusion that Regency West failed to carry its burden. The circuit court was not persuaded that Regency West established that it was more probable than not that the assessed values were excessive. The evidence supports the circuit court's conclusion.
¶ 105. Racine's experts, Furdek and Weissen-fluh, are well-versed in Wisconsin appraisal techniques as well as appraisal techniques for subsidized housing. Each has spent the majority of his career in the Milwaukee Assessor's Office; they have recently gone into private practice together. Contrary to the *325 majority opinion's assertion, both Furdek and Weis-senfluh have experience with Section 42 subsidized housing. In their respective tenures at the Milwaukee Assessor's office, they were directly involved with assessing Milwaukee's numerous Section 42 properties or reviewing and signing off on the assessments of Section 42 properties. Each has given presentations on valuing subsidized housing.
¶ 106. These experts submitted a thorough, nearly 70-page assessment report using several different valuation methodologies. They testified at length, concluding that Racine's initial assessments of Regency West were not excessive.
¶ 107. Furdek and Weissenfluh considered three traditional valuation approaches: sales comparison (tier two), income (tier three), and cost (tier three). The Manual at 9-52 states, referring to Wis. Stat. § 70.32, that "[t]he assessor should consider all three approaches to value when assessing federally subsidized properties." Indeed, all three approaches are set forth in the Manual at 9-52 to 9-54, discussing federally subsidized housing.
¶ 108. Before applying these assessment methodologies, Furdek and Weissenfluh explained Wisconsin assessment standards applying to subsidized housing, thoroughly examined Racine's real estate climate, and stated the assumptions upon which they based their analyses. This extensive pre-assessment analysis complies with the Manual, which provides:
Each type of property presents unique valuation problems. This requires the assessor to possess a great deal of knowledge about the current economic conditions of the area and any trends and factors that may influence the value of commercial property.
*326 [[Image here]]
Given the data used and the type of property appraised, the appraiser must consider how well each method employed estimates the value of the property. .. .
How does the appraiser determine which approach or approaches are most reliable? The best guidance that can be offered is to review the market activity for the subject and determine the attributes by which the market uses to evaluate alternative real estate decisions.
Manual at 9-1, 9-39.
¶ 109. Furdek and Weissenfluh also met with the Wisconsin Housing and Economic Development Authority (WHEDA) to discuss Section 42 and Section 8 federally subsidized housing. In Wisconsin, WHEDA administers Section 42 tax credits and publishes the maximum rents that may be charged to Section 42 tenants. Manual at 9-46. The WHEDA representative stated that Section 8 and Section 42 properties were economically comparable.
¶ 110. Based upon their conversation with WHEDA, Furdek and Weissenfluh concluded that most Land Use Restriction Agreements (LURAs) for Section 42 properties impose similar restrictions. They therefore used a sales comparison approach using other Section 42 properties.
¶ 111. Furdek and Weissenfluh primarily relied on a sales comparison approach that consisted of three properties. Their Report explains that the "sales [were] researched through numerous sources, inspected and verified by a party to the transaction." Two of the properties comprised a mix of Section 42 units and *327 market units. The other comparable property consisted of a building that was being converted into Section 42 housing.
¶ 112. Because the comparables Furdek and Weissenfluh found were not identical to Regency West, these experts complied with the Manual—they made adjustments in their comparisons. They explained that they took into account specific differences between the comparables and Regency West, including the location, age, and non-section 42 portions, to arrive at a value for Regency West. Only after making these adjustments did Furdek and Weissenfluh use the sales comparison approach to arrive at the value of the Regency West property. This valuation corroborated the original assessments.
1 113. Furdek and Weissenfluh also used two income approaches, a capitalization of income approach and a discounted cash flow analysis, and a cost approach. For each of these approaches, these experts used a combination of Regency West's actual expenses as well as projected expenses. The experts reconciled the values derived from each approach to reach a valuation.
¶ 114. Each of these valuation methodologies, independently and when reconciled with the others, confirmed that Janet Scites—Racine's assessor whose initial assessments Regency West challenged—got it right.
¶ 115. In stark contrast to the extensive, multifaceted evidence presented by Racine's experts, Regency West presented one expert, Scott McLaughlin. Although McLaughlin claimed that he specialized in assessing federally subsidized housing, the record does not reflect the extent of his Wisconsin-specific assess *328 ment experience. That said, the majority opinion relies extensively (indeed exclusively) on McLaughlin's testimony and report.
¶ 116. In the instant case, McLaughlin prepared a four-page report consisting only of a capitalization of income approach to valuation. This report was based on Regency West's projected expenses for 2012 and actual expenses for 2013. McLaughlin's report did not state his assumptions, nor did it consider market conditions affecting the value of property in Racine. Furthermore, McLaughlin's report does not explain the basis for his opinions or the figures that he uses. His testimony filled in some of this information.
¶ 117. McLaughlin's report concluded, based on his "extensive experience appraising IRC § 42 properties," that "[t]he inability to obtain reliable data regarding the rent and income restrictions for IRC § 42 properties prevents a valid comparable sales valuation in this case."
¶ 118. Nevertheless, McLaughlin derived a capitalization rate based on sales of fifteen Section 42 properties. Although McLaughlin claimed he could not perform a comparable sales analysis of Regency West because he did not have the Land Use Restriction Agreements (LURAs) for his list of fifteen Section 42 sales, McLaughlin relied on data from Section 42 sales to derive a capitalization rate for his income approach.[6] The majority opinion unsuccessfully attempts to explain away this inconsistency in McLaughlin's evidence regarding the availability of comparables.
*329 f 119. Based upon an income valuation approach alone, McLaughlin concluded that Regency West's value was nearly two million dollars less than the valuations that Racine or Furdek and Weissenfluh reached.
¶ 120. McLaughlin and the majority opinion rely solely on the income approach to conclude that Racine's original assessment was excessive. The majority opinion is unsuccessful in explaining away precedent. The cases have stated time and time again that the income approach "may never be the sole basis for an assessment of property." Waste Mgmt. of Wis. v. Kenosha Cty. Bd. of Review, 184 Wis. 2d 541, 558, 516 N.W.2d 695 (1994); see also Bischoff v. City of Appleton, 81 Wis. 2d 612, 260 N.W.2d 773 (1978).[7]
¶ 121. After comparing evidence presented by the experts, the circuit court unsurprisingly ruled in favor of Racine. The circuit court was persuaded by Racine's appraisers and experts, but was not impressed by McLaughlin. The circuit court stated its finding that Racine's assessors were more credible as follows:
Credibility of the assessors and experts is critical to this analysis. Based upon the years of experience, knowledge, and demeanor, this Court finds the testimony of the City's assessors and experts more credible than that of the plaintiffs expert, Scott McLaughlin. *330 The City's assessors and experts are very familiar and experienced in valuing property in the Racine and Southeastern Wisconsin area and McLaughlin is not.
Based on my review of the record, without even giving deference to the circuit court, I agree with the circuit court.
¶ 122. I conclude that Regency West has failed to present sufficient evidence showing that the initial assessments were excessive. Racine's assessors and experts presented the more persuasive evidence that Racine's initial assessments were not excessive.
IV
¶ 123. Before I end my analysis, I discuss court procedure. I dissented in an unpublished order granting review in the instant case. I repeat my objection in this published dissent to inform litigants and lawyers about court procedure.
¶ 124. On November 16, 2015, the court adopted a procedure governing when a justice may hold for further discussion a petition for review in which a Supreme Court Commissioner recommended granting review.
¶ 125. The procedure applies when the justices vote on the Wisconsin Supreme Court Commissioners' recommendations on petitions for review by e-mail. Most months the court votes on the recommendations in person, in closed conference. The new e-mail procedure states:
Regarding petitions for review, certifications, petitions to bypass, original actions, petitions for supervisory writ, and petitions for writ of mandamus, prohibition, quo warranto, and habeas corpus, some months are *331 scheduled as mail-in conferences, whereby each justice votes, by e-mail, on the recommendations of each Commissioner. A justice, who wishes to hold a matter for which a Commissioner has recommended granting review, must submit in writing, with his or her e-mail votes, the specific reason(s) why he or she would not approve the grant as recommended by the Commissioner. Within 5 calendar days of that writing, all justices shall vote, by e-mail, to grant the matter, deny the matter, or otherwise approve the suggestions in the written proposal. If sufficient votes to grant the matter remain, the grant order shall issue within two business days. If the matter no longer has the requisite votes to grant, it shall be discussed in a court conference, but in any event, no later than at the next in-person petition for review conference.
¶ 126. The new procedure was adopted without any notice to the Supreme Court Commissioners and Clerk of the Supreme Court, let alone the litigants, lawyers, and the public.[8]
¶ 127. Although I did not vote in favor of adopting this procedure, I have followed it. At the very least, the court should follow its adopted procedures. As I have written before, a scent of lawlessness pervades the court.
f 128. The effect of several newly adopted procedures (whether the effect is intended or not) is to silence an individual justice's voice—whether that justice wants to hold a petition for review for further discussion, write separately on a matter, or dissent.
*332 f 129. I have pledged to continue to discharge my duties on this court as the people of the state have four times elected me to do. The commitment I made to myself nearly 40 years ago and in four successive elections since then remains: Be independent, impartial, and non-partisan, and help the court system improve. I will continue to implement that commitment whether in the majority or in dissent.
¶ 130. We are a court of seven. Each justice is only one voice of seven. I will continue to be one justice with one voice, but mine will not be a timid voice as I continue to serve the people of the state of Wisconsin.
¶ 131. For the reasons set forth, I write on the merits of the case and court procedure.
¶ 132. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

 See majority op., ¶¶ 24, 31, 50 n.15.

 All parties agree that there are no recent arm's-length sales of Regency West, so a tier one analysis was not possible. The instant case is about which other tier analyses should be used.

 The majority misstates Furdek and Weissenfluh's report because the experts' pre-reconciliation value derived from the income approach was actually lower than the original assessments. After reconciling their various approaches, however, their appraisal was slightly higher than the original assessments.

 Manual at 9-44 to 9-54.

 Manual at 9—47. In both Racine and Milwaukee (the location of the comparables used by Racine's experts), Section 42 properties usually have a waiting list.

 There is no evidence that McLaughlin attempted to obtain the LURAs for any of these fifteen properties or communicated with WHEDA, buyers, sellers, or brokers to obtain information.

 See State ex rel. I.B.M. Corp. v. Bd. of Review, 231 Wis. 303, 312, 260 N.W. 784 (1939) ("Though net income from the rental of either real or personal property is always a proper element to consider, it cannot be considered as the sole controlling factor in determining value of either real or personal property. Such a rule, if given approval, would require a holding that non-income producing property is practically valueless for taxation purposes.").

 The procedure was adopted pursuant to the Introduction to the Supreme Court's Internal Operating Procedures, which states that the Internal Operating Procedures "may be changed without notice as circumstances require." The Supreme Court Internal Operating Procedures are available in Volume VI of the Wisconsin Statutes (2013-14).