# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:          2022AP507

†Petition for Review filed

Complete Title of Case:


            **VERITAS VILLAGE, LLC,**

                    **PLAINTIFF-APPELLANT,†**

            **V.**

            **CITY OF MADISON,**

                    **DEFENDANT-RESPONDENT.**


| | |
|---|---|
| Opinion Filed: | October 26, 2023 |
| Submitted on Briefs: | September 22, 2022 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Kloppenburg, P.J., Graham, and Nashold, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Jacob R. Sundelius* and *Patrick J. Coffey* of Menn Law Firm, Ltd., Appleton. |
| Respondent ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of *Jamie L. Staffaroni*, assistant city attorney, Madison. |

# COURT OF APPEALS
## DECISION
## DATED AND FILED

## October 26, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP507**

STATE OF WISCONSIN

Cir. Ct. No. 2019CV1469

IN COURT OF APPEALS

---

VERITAS VILLAGE, LLC,

    PLAINTIFF-APPELLANT,

V.

CITY OF MADISON,

    DEFENDANT-RESPONDENT.

---

APPEAL from a judgment of the circuit court for Dane County: MARIO WHITE, Judge. *Affirmed*.

Before Kloppenburg, P.J., Graham, and Nashold, JJ.

¶1 NASHOLD, J. Veritas Village, LLC ("Veritas") appeals a circuit court judgment upholding the City of Madison's 2018 tax assessment of Veritas's apartment building. Veritas challenges the assessment as excessive under WIS.

STAT. § 74.37 (2021-22).[1]  Specifically, Veritas argues that the City's assessment lost the presumption of correctness under WIS. STAT. § 70.49(2) because it did not comply with the *Wisconsin Property Assessment Manual* (2018) ("the Manual")[2] and that this court should therefore credit the significantly lower appraised value determined by Veritas's appraiser.

¶2      The circuit court credited the City's appraiser's appraised value over that of Veritas's appraiser, and the parties agree that the key difference between the two appraisals is the vacancy rates used by the appraisers in determining the value. Veritas argues that the City was required to use the actual 72% vacancy rate that existed on January 1, 2018, rather than a vacancy rate that took into account leases that were anticipated to occur after that date.  We disagree and therefore affirm the circuit court order.

## BACKGROUND

¶3      Veritas is the owner of a luxury four-story, multi-family property consisting of 189 apartment units located in the downtown area of Madison, Wisconsin ("the Property" or "the Veritas Property").  The Property consists of studio and one-, two-, and three-bedroom units.  The common area of the Property includes underground parking and amenities such as a fitness center, a yoga studio, a clubhouse, a coffee bar, an outdoor sundeck with pool, an outdoor lounge area and fire pit, outdoor grilling stations, a party room, and a bike room.

---

[1]  All references to the Wisconsin Statutes are to the 2021-22 version.

[2]  All references are to the 2018 version of the *Wisconsin Property Assessment Manual*, which is the version relied on by the parties and the circuit court.

¶4    Construction of the Property was completed in 2017 and leasing began in August of that year. As of January 1, 2018, the Property was 28% occupied, meaning that it was 72% vacant. The parties agree that the Property was in the process of "lease-up"[3] as of January 1, 2018; that it was anticipated that additional leases would be signed, thereby reducing the vacancy rate; and that, as of January 1, 2018, the Property was not yet "stabilized."[4]

¶5    The City assessed the Property at $17,780,000 based on the appraisal conducted by City appraiser Scott West. Veritas filed an objection to the City's assessment and hired private appraiser Dominic Landretti to conduct a retrospective appraisal, which valued the Property at $6,800,000. As stated, the difference in the appraised values was due primarily to the differing vacancy rates used by the two appraisers, with Landretti using a 72% vacancy rate that reflected the actual vacancy rate of the Property on January 1, 2018, and West using a vacancy rate that accounted for anticipated future leases.

¶6    The City subsequently hired private appraiser William Miller to complete a retrospective appraisal of the Property, and Miller valued the Property at $32,600,000. It is undisputed that the City's assessment was based on West's appraisal, not Miller's, and that Miller's appraisal served only to confirm the City's view that the assessment is not excessive.

---

[3] The parties use the term "lease-up," but neither the parties nor the Manual define it. We understand it to have the meaning offered by trial counsel for Veritas in his opening statement, which is essentially the period during which leases are being obtained on a newly constructed apartment building.

[4] During his testimony, West explained that a property is considered "unstabilized" when the vacancy level does not represent a market vacancy level.

¶7    The Board of Assessors for the City of Madison and the Board of Review sustained the City's assessment of $17,780,000. Veritas paid $400,322.62 in real estate taxes on the Property calculated from the $17,780,000 assessment and commenced this action against the City for excessive assessment under WIS. STAT. § 74.37.

¶8    The circuit court held a five-day bench trial, during which the court heard testimony from the three appraisers, West, Miller, and Landretti; and from Veritas's developer and managing member, Terrence Wall.

¶9    Following the submission of post-trial briefs, the circuit court issued a written decision. The court determined that Veritas did not overcome the presumption of correctness afforded the City's assessment under WIS. STAT. § 70.49(2). Specifically, the court concluded that West's appraisal complied with the Manual and with Wisconsin statutes and case law and that Veritas did not present significant contrary evidence. In comparing West's analysis to Landretti's, the court concluded that Landretti's analysis, "which utilized both actual and market data[,] creates a situation in which a completely vacant, luxury apartment complex has no value for tax assessment purposes." The court determined that the City's assessment and West's conclusions were more "reliable, credible, and persuasive than those offered by Veritas." Given these conclusions, the court declined to address Miller's analysis. Accordingly, the court sustained the City's assessment and entered judgment in favor of the City. Veritas appeals. Additional facts are discussed below as needed.

## DISCUSSION

### I. Standard of Review and General Principles of Law Governing Real Property Assessments

¶10 "Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual … from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale." WIS. STAT. § 70.32(1).

¶11 Pursuant to WIS. STAT. § 70.49(2), a tax assessment challenged under WIS. STAT. § 74.37 is given a presumption of correctness.[5] ***Metropolitan Assocs. v. City of Milwaukee***, 2018 WI 4, ¶50, 379 Wis. 2d 141, 905 N.W.2d 784. However, the presumption can be overcome if the challenging party establishes that the assessment does not apply the principles set forth in the Manual or presents "'significant contrary evidence.'" ***Bonstores Realty One, LLC v. City of Wauwatosa***, 2013 WI App 131, ¶¶5, 9, 351 Wis. 2d 439, 839 N.W.2d 893 (quoted source omitted). "Stated differently, when a city assessor correctly applies the [Manual] and Wisconsin Statutes, and there is no significant evidence to the contrary, courts will reject a party's challenge to the assessment." ***Allright Props., Inc. v. City of Milwaukee***, 2009 WI App 46, ¶12, 317 Wis. 2d 228, 767 N.W.2d 567.

¶12 WISCONSIN STAT. § 70.32(1) "sets forth a hierarchical valuation methodology for arriving at a property's fair market value." ***Lowe's Home Ctrs., LLC v. City of Delavan***, 2023 WI 8, ¶27, 405 Wis. 2d 616, 985 N.W.2d 69 (citing

---

[5] WISCONSIN STAT. § 70.49(2) provides: "The value of all real property entered into the assessment roll to which such affidavit is attached by the assessor shall, in all actions and proceedings involving such values, be presumptive evidence that all such properties have been justly and equitably assessed in proper relationship to each other."

***State ex rel. Markarian v. City of Cudahy***, 45 Wis. 2d 683, 685-86, 173 Wis. 2d 627 (1970)). This provision "lists three sources of information that inform tax assessments." ***Lowe's***, 405 Wis. 2d 616, ¶28. "The order in which these sources are listed is indicative of the quality of information each source provides." ***Id.***, ¶28. "This methodology has been described as providing three 'tiers' of analysis." ***Id.***

¶13 A tier 1 analysis is an examination of a recent arm's-length sale. ***Id.***, ¶29. "An arm's-length sale of the subject property is the best information of a property's fair market value, and is thus the first source of information to which an assessor should look in conducting an assessment." ***Id.***

¶14 If a tier 1 analysis cannot be conducted because "the property has not been recently sold, then the appraiser moves to a tier 2 analysis." ***Id.*** In a tier 2 analysis, the appraiser "examin[es] recent arm's-length sales of reasonably comparable properties (the 'sales comparison' approach)." ***Id.***

¶15 When both tier 1 and tier 2 are unavailable, the assessor moves to a tier 3 analysis. ***Id.***, ¶30. Under the tier 3 analysis, the assessor "may consider all the factors collectively that have a bearing on the value of the property," including "cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus, and appraisals produced by the owner." ***Id.*** The tier 3 framework includes, among other things, the "income approach, which seeks to capture the amount of income the property will generate over its useful life, and the cost approach, which seeks to measure the cost to replace the property." ***Adams Outdoor Advert., Ltd. v. City of Madison***, 2006 WI 104, ¶35, 294 Wis. 2d 441, 717 N.W.2d 803.

¶16    Here, Veritas brought an excessive assessment claim against the City pursuant to WIS. STAT. § 74.37(3)(d).  "The question on appeal in a WIS. STAT. § 74.37 action is not whether the initial assessment was incorrect, but whether it was excessive." *Metropolitan Assocs.* 379 Wis. 2d 141, ¶40.  "An action filed pursuant to § 74.37 seeks a trial before the circuit court, and is distinct from a certiorari action."  *Lowe's*, 405 Wis. 2d 616, ¶23.  In contrast to a certiorari action, an excessive assessment action under § 74.37 "is not confined to the record before the board and new evidence may be presented." *Id.*, ¶23 n.11.  Thus, "we review the circuit court's determination, not that of the assessor or Board of Review." *Id.*, ¶23.

¶17    Veritas's excessive assessment claim is premised on its argument that the City's assessment did not comply with the Manual and therefore lost the presumption of correctness.  "[W]e independently review whether a valuation complied with the statutes and the Wisconsin Property Assessment Manual." *Bonstores*, 351 Wis. 2d 439, ¶6.  However, we defer to the circuit court's findings of fact and "will not upset the court's factual findings, including findings involving the credibility of witnesses, unless they are clearly erroneous." *Id*.  "In particular, it is within the province of the factfinder to determine the weight and credibility of expert witnesses' opinions." *Id.*

## II. The Appraisals

¶18    As stated, West conducted an appraisal of the Property that formed the basis of the City's assessment of $17,780,000.[6] The explanation of his analysis that follows is not disputed.

¶19    West's appraisal incorporated the three-tier hierarchical valuation methodology described above. West did not conduct a tier 1 analysis because there was no recent arm's-length sale of the Property.

¶20    West attempted to conduct a tier 2 sales comparison using sales of three properties that are similar to the Veritas Property, but ultimately determined that the other properties were not sufficiently comparable to the Veritas Property for purposes of a tier 2 analysis. West selected these three properties because they had a similar use and were in a similar location or market to the Veritas Property. Then, in analyzing these other sales, West made adjustments to account for differences between these properties and the Veritas Property, and assigned a particular weight to each of the resulting figures. Due to the number of adjustments that he was required to make to account for the differences between these properties and the Veritas Property, West determined that the tier 2 sales comparison analysis was not appropriate.

---

[6] West initially valued the Property at $25,390,000, but then revised the value during the "open book period" to $19,570,000 in May 2018. After Veritas filed an objection to the assessment, West completed an objection report for the Property, recommending the revised assessment of $17,780,000. This objection report is referred to in this opinion as West's "appraisal" and, as stated, forms the basis of the City's assessment. The City notes that West made these changes to his appraised value based on additional information Veritas submitted to the City. Veritas does not dispute this representation.

¶21     Accordingly, West converted the data from the three recent sales into a tier 3 sales approach that compares the subject property to "like" or "similar" properties rather than to "reasonably comparable" properties.  This tier 3 sales approach will be referred to in this opinion as the "sales approach" to distinguish it from the tier 2 sales comparison analysis.  Under the tier 3 sales approach, West arrived at a value of $17,781,000 and assigned this sales approach value a 20% weight in his tier 3 "reconciliation" to reach his recommended assessed value.[7]

¶22     Also under tier 3, West conducted a cost approach analysis and three separate income approach analyses.  *See Wisconsin Property Assessment Manual*, 13-15 (describing cost and income approaches).  West did not place any weight on his cost approach analysis.  In the three income approach analyses, West estimated expenses based on an average of actual operating expenses for newer apartment complexes built in Madison in 2014-15.  Those expenses are not at issue in this appeal.  West also applied capitalization rates that are likewise not at issue in this appeal.

¶23     In his first income approach analysis, West averaged the 72% actual vacancy rate as of January 1, 2018, with the 5% market vacancy rate (38.5%) and rounded the result up to 40%.  This first income approach resulted in a valuation of approximately $17,520,000.  West assigned this valuation a 40% weight in his reconciliation.  West's second income approach analysis used a 5% vacancy rate and resulted in a valuation of approximately $18,040,000.  West also assigned this

---

[7] "Reconciliation" is defined in the Manual's glossary as "[t]he process by which the appraiser evaluates, chooses and selects from among two or more alternative conclusions or indications to reach a final value estimate." *Wisconsin Property Assessment Manual*, G-44; *see also id.*, 9-22 (reconciliation is "the process of evaluating and selecting from the alternative approaches to value").  "The final value estimate may be the value estimate derived from one of the approaches or may be a careful reconciliation of the applicable approaches." *Id.* at 9-23.

valuation 40% weight in his reconciliation. In his third income analysis, West again used a 5% vacancy rate but changed the capitalization rate and arrived at a valuation of approximately $29,300,000; however, he did not give this valuation any weight. In reconciling his tier 3 approaches, including the tier 3 sales approach referenced above, West arrived at an appraised value of $17,780,000 for the Property.

¶24     In contrast, Landretti's appraisal valued the Property at $6,800,000, using a 72% vacancy rate, which was the vacancy rate on January 1, 2018.[8]  Like West, Landretti determined that a tier 3 income approach was most appropriate. Unlike West, Landretti relied exclusively on the income approach for his assessment, whereas West determined that 20% weight should be assigned to the sales approach.  However, the primary reason for the difference in value between the West and Landretti analyses is that West used a substantially lower vacancy rate than Landretti, accounting for anticipated future leases.

¶25     The Manual contains a multi-step formula for determining value for commercial properties under the income approach. *Wisconsin Property Assessment Manual*, 13-16.  It is not disputed that the two main appraisals at issue, West's and Landretti's, used this formula and that the primary difference between the two appraisals involves the step in which an appraiser is to "[d]educt for vacancy and collection loss."  *Wisconsin Property Assessment Manual*, 13-16.  As Veritas acknowledges, "the only difference between West and Landretti's income approach

_____

[8] At the trial held in this matter, Landretti changed his appraised value to $8,500,000 after being provided information that eight additional leases had been signed for units that were not yet occupied as of January 1, 2018.  According to Landretti, this changed the vacancy rate from 72% to 68%.  The parties generally rely on the 72% figure in their briefs and this opinion follows their lead.

analyses was that West used projected vacancy rates [in this step], whereas Landretti used [the Property's] undisputed 72% vacancy rate."

### III. *Veritas's Arguments*

¶26 On appeal, Veritas argues that the City's assessment is not entitled to the presumption of correctness because West did not comply with the Manual in several respects. As a result, Veritas argues that Landretti's appraisal should be credited instead of West's. Before addressing these arguments, we first emphasize the following two undisputed points.

¶27 First, the appraisers all agreed that a tier 3 income approach is the most appropriate method for assessing the Property.[9] *See **Walgreen Co. v. City of Madison**,* 2008 WI 80, ¶24, 311 Wis. 2d 158, 752 N.W.2d 687 ("The [Manual] explains that in leased property scenarios, the income approach is often the most reliable approach for property valuation, describing the income approach as estimating and then capitalizing the net rent a property subject could generate.").

¶28 Second, the parties agree that the overarching issue in this case is how to account for vacancy under the income approach for a brand new building that is in the process of lease-up. Veritas argues that the vacancy rate should be 72%, reflecting the vacancies that existed on January 1, 2018, whereas the City argues that the vacancy rate should take into account a projection of leases that are reasonably anticipated to be signed after that date.

---

[9] As previously explained, West also used a sales approach; however, he assigned the sales approach value only a 20% weight in his reconciliation under his tier 3 analysis.

¶29    With those points in mind, we now address Veritas's specific arguments.

A.  Presumption of Correctness—the City's Assessment

¶30    Veritas argues that the City's assessment lost its presumption of correctness because, according to Veritas, West failed to follow the principles set forth in the Manual in the following four ways:  (1) West considered anticipated future leases in "direct contravention" to the Manual's principle of "change"; (2) West used a projected vacancy rate as opposed to the Property's actual vacancy rate; (3) West "mixed and matched" the economically independent methodologies in conducting his reconciliation; and (4) West was "unable to support or explain any of his opinions beyond assurances that he was simply exercising his 'judgment.'"[10] We address these arguments in turn.

*1. The Manual's Principle of Change*

¶31    Veritas argues that, by considering anticipated future leases, West's appraisal failed to comply with the Manual's principle of change.  This principle is one of several "valuation principles" identified in the Manual that form "the basis of the techniques used by the assessor to arrive at the market value of a given property."  *Wisconsin Property Assessment Manual*, 9-10.  The principle of change is described in the Manual as follows:

---

[10]  Veritas also asserts at various points in its brief that it is "undisputed that there was no market for [the Property] on January 1, 2018."  The City adamantly disputes this point.  Because Veritas does not develop an argument based on this assertion in any way as a separate basis for challenging the assessment as excessive, we do not address it.  *See **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

**Change**

> The factors that affect market value are constantly changing. Not only are economic, social and government forces constantly changing, but the property itself is subject to change. Because change is constant, every opinion of value is meaningful only in the context of the date to which i[t] applies. In Wisconsin, assessment values are always as of January 1. Any changes to the property, economy, or any other financial factors affecting value that occur after that date, are not considered until the following assessment cycle.

*Wisconsin Property Assessment Manual*, 9-13.

¶32 Veritas argues that, under this principle, leases signed after January 1, 2018, are "other financial factors affecting value" that cannot be considered in the valuation of the Property. In support of this contention, Veritas notes that all three appraisers (West, Miller, and Landretti), when asked by Veritas's counsel whether such future leases were "other financial factors affecting value," generally testified that they were. Because the City's assessment was based on West's appraisal, and it is this assessment that Veritas argues violated the Manual, we examine only West's testimony on this point. West testified as follows:

> Q. Now, you told me that brand-new leases, not ones that are occupied or not ones that are signed but not yet moved in, brand-new leases through 2018, after January 1, 2018 would be other financial factors affecting the value.
>
> A. Because they're after January 1st?
>
> Q. Yes. Is that correct?
>
> A. Correct.
>
> Q. So those new leases that have not either been occupied as of January 1, 2018 or have not at least been signed as of January 1, 2018 would be other financial factors affecting value and fall under the principle of change.
>
> A. That's one definition of it, yeah.

Notably, during this exchange, West did not testify that such future leases constitute "financial factors affecting value *that occur after* [January 1]," as set forth in the principle of change quoted above. In fact, during subsequent testimony, West made clear that he did not view the future leases as a factor affecting value that "occur[s] after that date" so as to be barred from consideration by the principle of change.

¶33 Specifically, the City's counsel asked West to explain how the principle of change works in conjunction with another valuation principle, "anticipation," which is described in the Manual as follows:

**Anticipation**

> One definition of value is the present worth of anticipated future benefits. These future benefits can be the amenities of home ownership, the receipt of an income, a place to run a business, or any other benefits that may be projected. It is the conversion of anticipated future benefits into a present value that is the basis of the valuation of property in the income approach.

*Wisconsin Property Assessment Manual*, 9-12 to 9-13. In response, West testified:

> A. Well, principle [of] anticipation, that's the whole foundation of the income approach, present worth of future anticipated benefits. So that's why you calculate a potential income for the property regardless of whether it was 70-percent vacant or not.
>
> You have to come up with a potential, if it was fully leased, and then you can apply a vacancy rate market or in this case I applied additional [vacancy] to take into consideration it wasn't stabilized.
>
> … *I didn't value anything that occurred after January 1st, in my opinion. I valued what was there as of January 1st, which was a brand-new 189-unit apartment complex.*

(Emphasis added.) Thus, West expressed the view that, in taking the anticipated future leases into account in his appraisal, he "didn't value anything that occurred

14

after January 1st," 2018. Instead, consistent with the change principle as reconciled with the anticipation principle, West valued the anticipated future leases as part of the *current value* of the Property.

¶34    Indeed, Veritas's interpretation of the change principle would nullify the anticipation principle. The anticipation principle expressly allows for consideration of benefits that are "anticipated," "future," and "projected," particularly when using the income approach for valuing property, which is the primary approach that West used. As stated above, under the anticipation principle, "value" is defined as "the present worth of anticipated future benefits." As also previously noted, the anticipation principle explicitly states that such "future benefits" can be "the *receipt of an income*, a place to run a business, *or any other benefits that may be projected*." (Emphasis added.) It also expressly states that "[i]t is the conversion of anticipated future benefits into a present value that is the basis of the valuation of property in the income approach."

¶35    Thus, if the principle of anticipation is to be given any effect, Veritas's interpretation of the principle of change cannot stand. Instead, these anticipated leases are financial factors affecting the *current* value of the property and, consistent with both principles, are properly considered. The reasonable anticipation of additional leases occurring in the lease-up period is a factor that was applicable on January 1, 2018, even if the leases themselves are not signed until after that date.

¶36    Other directives in the Manual likewise support the conclusion that reasonably anticipated future leases are properly considered in assessing value under the income approach. For example, the Manual states that the process under the income approach consists of "converting anticipated future benefits (income)

into an estimate of the present worth of the property." *Wisconsin Property Assessment Manual*, 13-15. The Manual also states:

> The **income approach** to value is based on the principle of anticipation. It is the calculation of present value based on anticipated future benefits. Typically these benefits are in terms of rents and other income that the property *may produce* either directly or indirectly. These are compared to the typical rents and expenses of similar property types in developing an opinion of value. The income approach relies on *estimating the net rent that the subject property could generate*, then capitalizing the rent by an appropriate rate.

*Wisconsin Property Assessment Manual*, 9-22 (italics added). Thus, it can hardly be clearer under the explicit language of the Manual that anticipated leases are properly considered in determining the present value of the Property.

¶37 The Manual further states that the income approach represents "the way investors think when they buy and sell income property in the market." *Wisconsin Property Assessment Manual*, 13-15. It is unreasonable to conclude that a seller would agree to a price based on the actual vacancy rate on January 1, 2018, if the seller reasonably expects the vacancy rate to decrease in the coming months. Thus, Veritas's interpretation of the principle of change fails to take into account the goal of an appraisal, which is to determine how much the Property would sell for in a private arm's-length sale. *See* WIS. STAT. § 70.32(1) ("Real property shall be valued by the assessor … from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale."); ***Doneff v. City of Two Rivers Bd. of Rev.***, 184 Wis. 2d 203, 213-14, 516 N.W.2d 383 (1994) ("[F]ull value" as used in § 70.32(1) means "'the amount [the property] will sell for upon arm's-length negotiation in the open

market, between an owner willing but not obliged to sell, and a buyer willing but not obliged to buy.'" (quoted source omitted)).

¶38 Faced with the Manual's language supporting West's analysis, Veritas suggests in its reply that the way to harmonize the principle of change with the principle of anticipation is to disallow consideration of future leases that do not yet exist but to allow consideration of *signed* leases for not-yet-occupied units. Veritas states: "[T]he doctrine of anticipation allows appraisers to consider the 'future benefit' of signed leases. The doctrine of change prevents appraisers from attempting to consider the 'future benefit' of future leases that do not yet exist." This is so, according to Veritas, because "appraisers cannot reasonably project or anticipate the value of unsigned leases." Veritas cites no authority for the proposition that an assessor cannot reasonably estimate the value of unsigned leases, and its argument that only signed leases may be considered is unpersuasive, given the language of the Manual quoted above.

¶39 Accordingly, we reject Veritas's argument that, by considering anticipated future leases in valuing the Property, the City's assessment violated the Manual's principle of change.

*2. Projected Vacancy Rate vs. Actual Vacancy Rate*

¶40 Veritas argues that West improperly relied on a projected vacancy rate as opposed to the Property's much higher actual vacancy rate of 72%. Veritas contends that this was contrary to the Manual and to case law concluding that actual data is superior to projected data. Veritas neither refers to nor cites any part of the Manual in support of this argument, and, therefore, we do not consider its argument on this topic as it relates to the Manual. *See **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we need not address undeveloped arguments).

We now explain why we reject Veritas's argument that, by not using a vacancy rate of 72%, the City's assessment was contrary to case law addressing the use of actual, rather than projected, data.

¶41     Veritas relies primarily on *Metropolitan Holding Co. v. Board of Review*, 173 Wis. 2d 626, 495 N.W.2d 314 (1993).[11]  In that case, Metropolitan built a housing complex.  *Id.* at 628.  In return for federal financing through the federal Department of Housing and Urban Development (HUD), the actual rent that Metropolitan received was restricted in several ways.  *Id.*  For example, HUD controlled the maximum amount of rent that Metropolitan could charge and it limited the amount that Metropolitan could retain after expenses, with any excess profits reverting to HUD.  *Id.* at 629.  At issue was "the proper annual income figure to be used when assessing a subsidized housing project under the capitalization of income approach."  *Id.* at 628.  The City of Milwaukee argued that annual income should be based on estimated market rents and expenses, whereas Metropolitan argued that annual income should be based on its actual income and expenses.  *Id.*

¶42     Our supreme court concluded that the use of estimated market rents violated WIS. STAT. § 70.32 because a valuation based on estimated market rents exceeded the fair market value of Metropolitan's property.  *Id.* at 631.  The court reasoned that the property was "hindered by the HUD restrictions and it is undisputed that the HUD restrictions precluded Metropolitan from charging market

_____

[11] In a part of its brief other than the "Argument" section, Veritas cites other cases in support of its assertion that West was required to use the "actual data" of a 72% vacancy rate rather than estimated data.  Specifically, Veritas cites *Rosen v. Milwaukee*, 72 Wis. 2d 653, 242 N.W.2d 681 (1976); *State ex rel. Garton Toy Co. v. Mosel*, 32 Wis. 2d 253, 145 N.W.2d 129 (1966); *State ex rel. Park Plaza Shopping Center, Inc. v. Board of Review*, 61 Wis. 2d 469, 213 N.W.2d 27 (1973); *Fontana v. Village of Fontana-on-Geneva Lake*, 107 Wis. 2d 226, 319 N.W.2d 900 (Ct. App. 1982).  To the extent Veritas means to incorporate these cases into its argument, they do not assist Veritas because they do not involve vacancies in a newly constructed apartment complex in the process of lease-up.

rents." *Id.* The court stated that the city assessor "essentially pretended that [the plaintiff] was not hindered by the HUD restrictions and valued the property at the amount the property would bring in an arm's-length transaction if Metropolitan were able to charge market rents." *Id.*

¶43 *Metropolitan* is inapplicable here because no such encumbrances affect the Property. Veritas asserts that the Property was "encumbered" by the 72% vacancy rate. However, this vacancy rate of a newly built, luxury property during the lease-up period is not remotely similar to encumbrances like the HUD restrictions in *Metropolitan*.[12] The HUD restrictions constituted a federally imposed encumbrance on Metropolitan's ability to charge market rents, whereas here, the vacancy rate of the Property is reasonably anticipated to decrease throughout the lease-up period.

¶44 Further, West's analysis is consistent with the *Metropolitan* court's directive that the assessment reflect market value. As set forth above, the Manual directs how to determine the market value under the income approach, namely, by "converting anticipated future benefits (income) into an estimate of the present worth of the property." As stated differently above, the market value "is the calculation of present value based on anticipated future benefits," which are "[t]ypically … rents and other income that the property may produce." This is consistent with West's testimony that he did not run an income approach with the 72% vacancy rate because, in his professional judgment, it "would [not] reflect the

---

[12] Veritas also asserts that West "ignore[d]" actual data, namely, the 72% vacancy rate. The record does not support this assertion. As set forth above, in his first income approach analysis, West averaged the 72% actual vacancy rate with the 5% market vacancy rate and rounded the result to a 40% vacancy rate. This first income approach resulted in a valuation of approximately $17,500,000 and West assigned this valuation 40% weight in his reconciliation under the tier 3 analysis.

market value of the property as of January 1, 2018." West's analysis is not only consistent with *Metropolitan*, but with other case law that rejects a requirement that actual data be used when such data does not reflect market value. *See, e.g.*, *Walgreen*, 311 Wis. 2d 158, ¶¶36-53 (where taxpayer negotiated above-market rents, market rents rather than actual rents are appropriate in assessing valuation under income approach).

¶45     West's analysis is also consistent with the Manual's directive on how to incorporate vacancy rates under the income approach:

> Rental properties are rarely fully occupied during their rental life; therefore, a deduction should be made from the potential gross income to compensate for lost income due to vacancies. *This vacancy allowance can be determined by an analysis of the vacancy factors of other comparable properties and the recent vacancy history of the subject property.* Care should be taken to make sure the noted vacancies are from stabilized projects....

*Wisconsin Property Assessment Manual*, 13-18 (emphasis added).

¶46     For all of these reasons, we reject Veritas's argument that West was required to rely *solely* on the actual vacancy rate as of January 1, 2018, in his appraisal of the Property.

### 3.  *"Mixing and Matching"*

¶47     Veritas next argues that West failed to follow the Manual by "mixing and matching economically independent methodologies in 'reconciliation.'" Veritas relies on the following passage in the Manual:

> Reconciliation is the process by which the appraiser evaluates and selects from the alternative approaches to value. Keep in mind that the three approaches to value are designed to be economically "independent." That is, the foundation for each reflects independent method and data.

> For the sales comparison approach, it's sales data. For the cost approach, it's cost of construction material, cost of labor, soft costs, and depreciation data. For the income approach, it's rental and financial data.
>
> Assessors may *consider* all three approaches when estimating the value of a property. However, all three approaches may not be used as the basis for an assessment because of case law[.] [Citing ***Markarian***, 45 Wis. 2d at 686.]

*Wisconsin Property Assessment Manual*, 13-41. According to Veritas, West's reconciliation, in which he applied a weighted average of his tier 3 approaches, was in "direct contravention" of this language from the Manual stating that an appraiser "evaluates and selects from the alternative approaches" but that "all three approaches may not be used as the basis for an assessment because of case law."[13] We reject Veritas's arguments for the following reasons.

¶48    First, it is clear from this excerpt of the Manual that the economic independence of the approaches refers to the independence of their data: *i.e.*, "[f]or the sales comparison approach, it's sales data. For the cost approach, it's cost of construction material, cost of labor, soft costs, and depreciation data. For the income approach, it's rental and financial data." Veritas points to nothing in the record showing that West's appraisal mixed these data in his analyses under the income and sales approaches that formed the basis of his appraisal.

---

[13] Veritas asserts that "West's appraisal is a mix of five different 'economically independent' approaches to value." We assume that Veritas is referring to the five analyses that West conducted under tier 3: analyses under a sales approach, a cost approach, and three income approaches. However, the record does not support Veritas's assertion that there were five approaches that formed "the basis for [the] assessment" as contemplated by the passage from the Manual quoted above. Instead, the record is clear that only three of the analyses were given any weight—two analyses under the income approach that yielded respective values of $17,520,000 and $18,040,000, to which West assigned a weight of 40% each; and one analysis under the sales approach that yielded a value of $17,781,000, to which West assigned a weight of 20%. The other two (under a cost approach and a third income approach) were given no weight and thus did not form any part of the "basis for [the] assessment," as contemplated by the language of the Manual.

¶49 As to the last sentence of the excerpt from the Manual quoted above that "all three approaches may not be used as the basis for an assessment because of case law," we note that the case law cited for that proposition is *Markarian*, which, as set forth above, establishes the three-tier hierarchy for valuing property. As previously explained, under the *Markarian* hierarchy, an assessor must use tier 1 (an arm's-length sale of the subject property) if there has been such a sale; may only use tier 2 (sales of reasonable comparable properties) if there is no recent arm's-length sale of the subject property, and may only use a tier 3 analysis (including the cost and income approaches) if there is no arm's-length sale of the subject property or sufficient data from sales of comparable properties. *See Markarian*, 45 Wis. 2d at 686; *see also Adams*, 294 Wis. 2d 441, ¶34. At no point does *Markarian* prohibit the use of multiple approaches within a single tier, tier 3, as occurred here. Thus, we construe the last sentence to refer to the use of *Markarian*'s three tiers and not to the use of multiple approaches within tier 3, such as the income, cost, and sales approaches used here.

¶50 Indeed, as we now explain, a prohibition on the use of multiple approaches within tier 3 would violate the express provisions of the Manual and would contradict case law.

¶51 As to the Manual, in addition to the excerpt above stating that "[a]ssessors may consider all three approaches [sales, cost, and income] when estimating the value of a property," the Manual further provides:

> The appraiser should consider all three approaches when estimating the value of a property….
>
> ….
>
> … Usually more than one—*and often all three*—of the approaches apply to a given property. The only limiting

> factor: whether available and appropriate data exists to develop any and all approaches.
>
> … Generally, *the greatest weight should be placed* on the approach for which the greatest amount of reliable and appropriate data is *available* that will yield the highest degree of confidence.
>
> *The final value estimate may be the value estimate derived from one of the approaches or may be a careful reconciliation of the applicable approaches.*

*Wisconsin Property Assessment Manual*, 9-23 (emphasis added). This language allows an appraisal to rely on more than one approach in conducting a tier 3 analysis and to ascribe weight to the various approaches.

¶52 Not only is it *permissible* under the Manual to rely on more than one approach in a tier 3 analysis but, as our supreme court held in *Adams*, it is sometimes *required*. *See Adams*, 294 Wis. 2d 441, ¶¶48-56. In *Adams*, the court concluded that the City's assessor erred in relying on only the income approach for his tier 3 analysis rather than relying on both the income and cost approaches. *See id.*, ¶56. The court based this conclusion, in part, on language from the Manual quoted directly above. *Id.*, ¶¶52-53. The court also relied on the Manual's requirement that, when there is sufficient data to estimate market value under both the income and cost approaches, assessors should determine a final estimate of value through the process of reconciliation. *Id.* at ¶54. The court described reconciliation as follows: "Reconciliation requires an assessor to evaluate the data available under the alternative approaches and decide whether to derive the value from one of the *approaches or a combination of approaches*." *Id.* (emphasis added). The court also relied on precedent concluding that "an assessment cannot be based solely on the income approach." *Id.* at ¶¶48, 50-51.

¶53    Thus, both the Manual and case law expressly permit what West did here:  deriving an estimate of the Property's value by ascribing 40% weight to each of the two income approaches, and 20% weight to the sales approach during the reconciliation process.  Accordingly, Veritas has not shown that West's appraisal failed to comply with the Manual by an impermissible "mixing and matching."

### 4. Exercise of Judgment

¶54    Veritas asserts that West failed to apply the Manual's principles "by being pervasively unable to support or explain any of his opinions beyond assurances that he was simply exercising his 'judgment.'"  As a preliminary matter, we observe that the examples provided are far from "pervasive[]."  More importantly, however, Veritas has failed to demonstrate that West impermissibly relied on his judgment in making adjustments to the data used in his approaches to value.

¶55    Veritas first relies on an approach that West considered but did not end up relying on in his final valuation.  For example, Veritas refers to statements West made in describing a cost approach he examined but ultimately did not place any weight on.  Because the cost approach was not used in West's appraisal and Veritas makes no argument that it should have been, we do not consider any asserted errors in West's examination of the cost approach.

¶56    Veritas also refers to a 30% vacancy rate that West applied in a second appraisal prior to the Board of Review hearing but which played no role in West's final appraisal.  As Veritas itself acknowledges in its reply brief, West's final appraisal "is the only valuation subject to appeal."  Thus, as the City points out, any criticisms of the appraisals conducted prior to the Board of Review hearing are not germane to this appeal.

¶57      As to the appraisal that is the subject of this appeal, Veritas argues that West's assignment of 20% weight to the sales approach and 40% to each of the two income approaches was based solely on his "judgment."  However, the record cite Veritas provides does not support that assertion.  Veritas further suggests that West's assignment of 20% weight to the sales approach must be based solely on "judgment," given West's testimony that he "lacked reasonable confidence" in that approach.  This statement is taken out of context.  West was asked by counsel for Veritas, "Why 20 percent to the sales approach?" and West responded, "Again, I went back to what I stated earlier, after applying, making adjustments that I did, I did not have reasonable confidence in that.  So I gave more weight to the income approach."  In context, it is clear that in making that statement, West is comparing his lower level of confidence in the sales approach to his higher level of confidence in the income approach.

¶58      Veritas also notes that when West was asked about why he applied a 15% vacancy deduction to the Property in comparing it to the three other properties under the sales approach, West ultimately responded that it was based on his "judgment."  But the Manual expressly allows appraisers to make adjustments for economic factors reflecting the differences between the subject and comparable (or similar) properties in a sales approach.  *See Wisconsin Property Assessment Manual*, 13-12 to 13-13.  And, as West further explained during his testimony, the Manual does not provide specific numerical adjustments that are required to be made during this process and an appraiser must rely on other information and on the appraiser's own training, experience, and professional judgment.

¶59      For example, regarding the sales approach, West testified that neither the Manual, statutes, nor case law instruct appraisers on how to specifically make a

quantitative adjustment to a sales comparison. When asked how he would compare a brand-new, unstabilized apartment complex to a similarly situated stabilized apartment complex, West testified that he would conduct "research in the market and make appropriate adjustments to account for the fact that the subject was not stabilized." His adjustment percentages are based on studying the market and relevant professional publications, interviewing buyers and sellers, analyzing the data, and coming up with "reasonable" adjustments. He further testified that his adjustments and judgment are based on his "knowledge and experience of analyzing the Madison real estate market for 14-plus years." West also testified as to his training on how to make adjustments, such as courses he has taken from the International Association of Assessing Officers.

¶60    As to any assumptions West makes when applying the various approaches, West testified that such assumptions are based on his "knowledge of the market," including from "field[ing] sales" and routinely reviewing professional publications addressing commercial property, reviewing building permit information, and talking to brokers and financial institutions. He testified that it is "a year-round cycle of reviewing market data because we do mass appraisals, so we have to review the most current data we have so that we can apply it to our annual assessments."

¶61    Veritas points to nothing in the Manual that says that an appraiser may not base adjustments or other determinations on professional judgment when neither the Manual nor statutory or case law provide specific instructions on how to make a particular adjustment or determination. As West explained, professional judgment is not the same as a guess and it is in fact his job to have "an opinion based on facts."

¶62 We agree that exercising professional judgment is an inherent part of an appraiser's job. Veritas's arguments that West improperly did so are unsupported and unpersuasive. This is particularly so in light of the testimony summarized above and the circuit court's findings regarding the credibility and weight of the evidence. After a five-day trial, the court explicitly found that the City's assessment and West's conclusions on which the assessment was based were more "reliable, credible, and persuasive than those offered by Veritas." We defer to the court's findings of fact and "will not upset the court's factual findings, including findings involving the credibility of witnesses, unless they are clearly erroneous." *See* ***Bonstores***, 351 Wis. 2d 439, ¶6. Although this court may determine whether an appraiser complied with the Manual and other legal requirements, "it is within the province of the factfinder to determine the weight and credibility of expert witnesses' opinions." ***Id.*** And, as set forth above, Veritas has not demonstrated legal error.[14]

## B. Veritas's Remaining Arguments

¶63 Veritas argues that, in the absence of the presumption of correctness, this court should credit Landretti's appraisal over West's because, according to

---

[14] In its brief-in-chief, Veritas also briefly asserts in a footnote that West's rounding one of his calculations of the vacancy rate in the income approach from 38.5% to 40% was "arbitrary." In support, Veritas relies on this court's decision in ***ABKA Limited Partnership v. Board of Review***, 224 Wis. 2d 551, 591 N.W.2d 879 (Ct. App. 1999), *aff'd*, 231 Wis. 2d 328, 603 N.W.2d 217 (1999). We initially note that this case was subsequently taken up by our supreme court, which affirmed our decision. Assuming we may nevertheless rely on our decision in ***ABKA***, it does not assist Veritas. In ***ABKA***, we concluded that the municipality erred in rounding the *actual assessed value* up by 2%. ***Id.*** at 569-70. We did not conclude that an assessor is prohibited from rounding a number that is used to arrive at the ultimate assessment, such as the vacancy rate in this case. Moreover, Veritas fails to show why such rounding would assist Veritas in its excessive assessment claim, given that this rounding inures to Veritas's benefit by applying a greater vacancy rate, thereby resulting in a lower assessment.

Veritas, Landretti followed the Manual by using the actual vacancy rate of the Property.

¶64    The primary problem with Veritas's argument is that it assumes we agree with Veritas that the presumption of correctness does not apply. However, we have decided to the contrary.[15] Veritas makes no argument that we may credit Landretti's appraisal over West's where the presumption remains in effect. Thus, given our conclusion that the presumption applies, we may reject as undeveloped any argument Veritas may mean to make that we should credit Landretti's appraisal over West's. *See **Pettit***, 171 Wis. 2d at 646.

¶65    Even assuming, however, that Veritas has offered a developed argument that we should "credit Dominic Landretti's appraisal, and hold that [the Property's] 2018 taxable value was $8,500,000,"[16] its argument fails because it depends on legal challenges that we have rejected in our preceding discussion. These challenges are based on a single premise—that West erred in not using the 72% (or 68%) vacancy rate that Landretti used—a premise that we have also

---

[15]  Notably, Veritas did not argue in the circuit court and does not argue in this court that it presented "significant contrary evidence" so as to rebut the presumption of correctness. *See **Bonstores Realty One, LLC v. City of Wauwatosa***, 2013 WI App 131, ¶¶5, 9, 351 Wis. 2d 439, 839 N.W.2d 893 (presumption of correctness may be overcome if assessment does not comply with Manual or if "significant contrary evidence" is presented). In fact, Veritas specifically disavows such an argument, stating that the significant contrary evidence standard is "inapplicable" in this case and that "[h]ere, Veritas never argued under the 'significant contrary evidence standard' and instead established that West failed to follow [the Manual's] principles in numerous manners."

[16]  This $8,500,000 amount reflects Landretti's revised valuation at trial that uses a 68% vacancy rate, taking into account an additional eight signed leases for units that were still vacant as of January 1, 2018. As previously explained, Landretti's original valuation was $6,800,000, compared to the City's assessment of $17,780,000.

rejected. Because Veritas presents no other basis for us to conclude that the City's assessment was excessive, we affirm the circuit court.[17]

## CONCLUSION

¶66 For the reasons stated, Veritas has failed to show that the City's 2018 assessment of the Property was excessive within the meaning of WIS. STAT. § 74.37. Accordingly, we affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.

---

[17] For the same reasons, we also reject Veritas's argument that "the City and [circuit] court erred by rejecting [the Manual's] mandated results based upon preconceived notions of the [Property's] value."